# JAMES B. BEAM DISTILLING CO. *v.* GEORGIA ET.AL.

No. 89–680.   Argued October 30, 1990—Decided June 20, 1991

530

*Morton Siegel* argued the cause for petitioner. With him on the briefs were *John L. Taylor, Jr.*, and *Richard Schoenstadt.*

*Amelia Waller Baker*, Assistant Attorney General of Georgia, argued the cause for respondents. With her on the brief were *Michael J. Bowers*, Attorney General, *H. Perry Michael*, Executive Assistant Attorney General, *Harrison Kohler*, Deputy Attorney General, *Daniel M. Formby*, Senior Assistant Attorney General, and *Warren R. Calvert*, Assistant Attorney General.*

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Alabama et al. by *Mary Sue Terry*, Attorney General of Virginia, *H. Lane Kneedler*, Chief Deputy Attorney General, *Gail Starling Marshall*, Deputy Attorney General, and *Peter W. Low*, joined by the Attorneys General for their respective States as follows: *Don Siegelman* of Alabama, *Robert*

JUSTICE SOUTER announced the judgment of the Court and delivered an opinion, in which JUSTICE STEVENS joins.

The question presented is whether our ruling in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), should apply retroactively to claims arising on facts antedating that decision. We hold that application of the rule in that case requires its application retroactively in later cases.

I

Prior to its amendment in 1985, Georgia state law imposed an excise tax on imported alcohol and distilled spirits at a rate double that imposed on alcohol and distilled spirits manufactured from Georgia-grown products. See Ga. Code Ann. § 3–4–60 (1982). In 1984, a Hawaii statute that similarly distinguished between imported and local alcoholic products was held in *Bacchus* to violate the Commerce Clause. *Bacchus*, 468 U. S., at 273. It proved no bar to our finding of unconstitutionality that the discriminatory tax involved intoxicating liquors, with respect to which the States have heightened

*K. Corbin* of Arizona, *Steve Clark* of Arkansas, *Duane Woodard* of Colorado, *Linley E. Pearson* of Indiana, *Thomas J. Miller* of Iowa, *William J. Guste, Jr.*, of Louisiana, *James E. Tierney* of Maine, *J. Joseph Curran, Jr.*, of Maryland, *Hubert H. Humphrey III* of Minnesota, *Robert J. Del Tufo* of New Jersey, *Robert Abrams* of New York, *R. Paul Van Dam* of Utah, *Jeffrey L. Amestoy* of Vermont, and *Don Hanaway* of Wisconsin; for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *Richard F. Finn,* Supervising Deputy Attorney General, and *Eric J. Coffill, Clarine Nardi Riddle,* Attorney General of Connecticut, *Robert A. Butterworth,* Attorney General of Florida, *Warren Price III,* Attorney General of Hawaii, *James T. Jones,* Attorney General of Idaho, *Frank J. Kelley,* Attorney General of Michigan, *Robert M. Spire,* Attorney General of Nebraska, *Hal Stratton,* Attorney General of New Mexico, *Anthony J. Celebrezze, Jr.,* Attorney General of Ohio, *Roger A. Tellinghuisen,* Attorney General of South Dakota, *R. Paul Van Dam,* Attorney General of Utah, *Kenneth O. Eikenberry,* Attorney General of Washington, *Roger W. Thompkins,* Attorney General of West Virginia, *Donald J. Hanaway,* Attorney General of Wisconsin, and *Herbert O. Reid, Sr.;* and for the Council of State Governments et al. by *Charles Rothfeld* and *Benna Ruth Solomon.*

regulatory powers under the Twenty-first Amendment. *Id.*, at 276.

In *Bacchus'* wake, petitioner James B. Beam Distilling Co., a Delaware corporation and Kentucky bourbon manufacturer, claimed Georgia's law likewise inconsistent with the Commerce Clause, and sought a refund of $2.4 million, representing not only the differential taxation but the full amount it had paid under § 3–4–60 for the years 1982, 1983, and 1984. Georgia's Department of Revenue failed to respond to the request, and Beam thereafter brought a refund action against the State in the Superior Court of Fulton County. On cross-motions for summary judgment, the trial court agreed that § 3–4–60 could not withstand a *Bacchus* attack for the years in question, and that the tax had therefore been unconstitutional. Using the analysis described in this Court's decision in *Chevron Oil Co.* v. *Huson,* 404 U. S. 97 (1971), the court nonetheless refused to apply its ruling retroactively. It therefore denied petitioner's refund request.

The Supreme Court of Georgia affirmed the trial court in both respects. The court held the pre-1985 version of the statute to have violated the Commerce Clause as, in its words, an act of "simple economic protectionism." See 259 Ga. 363, 364, 382 S. E. 2d 95, 96 (1989) (citing *Bacchus*). But it, too, applied that finding on a prospective basis only, in the sense that it declined to declare the State's application of the statute unconstitutional for the years in question. The court concluded that but for *Bacchus* its decision on the constitutional question would have established a new rule of law by overruling past precedent, see *Scott* v. *State,* 187 Ga. 702, 2 S. E. 2d 65 (1939) (upholding predecessor to § 3–4–60 against Commerce Clause objection), upon which the litigants may justifiably have relied. See 259 Ga., at 365, 382 S. E. 2d, at 96. That reliance, together with the "unjust results" that would follow from retroactive application, was thought by the court to satisfy the *Chevron Oil* test for prospectivity. To the dissenting argument of two justices

that a statute found unconstitutional is unconstitutional *ab initio*, the court observed that while it had "'declared statutes to be void from their inception when they were contrary to the Constitution at the time of enactment, . . . those decisions are not applicable to the present controversy, as the original . . . statute, when adopted, was not violative of the Constitution under court interpretations of that period.'" 259 Ga., at 366, 382 S. E. 2d, at 97 (quoting *Adams* v. *Adams*, 249 Ga. 477, 478–479, 291 S. E. 2d 518, 520 (1982)).

Beam sought a writ of certiorari from the Court on the retroactivity question.[1] We granted the petition, 496 U. S. 924 (1990), and now reverse.

## II

In the ordinary case, no question of retroactivity arises. Courts are as a general matter in the business of applying settled principles and precedents of law to the disputes that come to bar. See Mishkin, Foreword: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56, 60 (1965). Where those principles and precedents antedate the events on which the dispute turns, the court merely applies legal rules already decided, and the litigant has no basis on which to claim exemption from those rules.

It is only when the law changes in some respect that an assertion of nonretroactivity may be entertained, the paradigm case arising when a court expressly overrules a precedent upon which the contest would otherwise be decided differently and by which the parties may previously have regulated their conduct. Since the question is whether the court should apply the old rule or the new one, retroactivity is

---

[1] Although petitioner expends some effort, see Brief for Petitioner 5–8, in asserting the unconstitutionality under *Bacchus* of the Georgia law as amended, see Ga. Code Ann. § 3–4–60 (1990), an argument rejected by the Georgia Supreme Court in *Heublein, Inc.* v. *State*, 256 Ga. 578, 351 S. E. 2d 190 (1987), that issue is neither before us nor relevant to the issue that is.

properly seen in the first instance as a matter of choice of law, "a choice . . . between the principle of forward operation and that of relation backward." *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.*, 287 U. S. 358, 364 (1932). Once a rule is found to apply "backward," there may then be a further issue of remedies, *i. e.*, whether the party prevailing under a new rule should obtain the same relief that would have been awarded if the rule had been an old one. Subject to possible constitutional thresholds, see *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation*, 496 U. S. 18 (1990), the remedial inquiry is one governed by state law, at least where the case originates in state court. See *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167, 210 (1990) (STEVENS, J., dissenting). But the antecedent choice-of-law question is a federal one where the rule at issue itself derives from federal law, constitutional or otherwise. See *Smith, supra,* at 177–178 (plurality opinion); cf. *United States* v. *Estate of Donnelly*, 397 U. S. 286, 297, n. (1970) (Harlan, J., concurring).

As a matter purely of judicial mechanics, there are three ways in which the choice-of-law problem may be resolved. First, a decision may be made fully retroactive, applying both to the parties before the court and to all others by and against whom claims may be pressed, consistent with res judicata and procedural barriers such as statutes of limitations. This practice is overwhelmingly the norm, see *Kuhn* v. *Fairmont Coal Co.*, 215 U. S. 349, 372 (1910) (Holmes, J., dissenting), and is in keeping with the traditional function of the courts to decide cases before them based upon their best current understanding of the law. See *Mackey* v. *United States*, 401 U. S. 667, 679 (1971) (Harlan, J., concurring in judgments in part and dissenting in part). It also reflects the declaratory theory of law, see *Smith, supra,* at 201 (SCALIA, J., concurring in judgment); *Linkletter* v. *Walker*, 381 U. S. 618, 622–623 (1965), according to which the courts

are understood only to find the law, not to make it. But in some circumstances retroactive application may prompt difficulties of a practical sort. However much it comports with our received notions of the judicial role, the practice has been attacked for its failure to take account of reliance on cases subsequently abandoned, a fact of life if not always one of jurisprudential recognition. See, *e. g.*, *Mosser* v. *Darrow*, 341 U. S. 267, 276 (1951) (Black, J., dissenting).

Second, there is the purely prospective method of overruling, under which a new rule is applied neither to the parties in the law-making decision nor to those others against or by whom it might be applied to conduct or events occurring before that decision. The case is decided under the old law but becomes a vehicle for announcing the new, effective with respect to all conduct occurring after the date of that decision. This Court has, albeit infrequently, resorted to pure prospectivity, see *Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971); *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 88 (1982); *Buckley* v. *Valeo*, 424 U. S. 1, 142–143 (1976); *England* v. *Louisiana State Bd. of Medical Examiners*, 375 U. S. 411, 422 (1964); see also *Smith, supra,* at 221, n. 11 (STEVENS, J., dissenting); *Linkletter, supra,* at 628, although in so doing it has never been required to distinguish the remedial from the choice-of-law aspect of its decision. See *Smith, supra,* at 210 (STEVENS, J., dissenting). This approach claims justification in its appreciation that "[t]he past cannot always be erased by a new judicial declaration," *Chicot County Drainage Dist.* v. *Baxter State Bank*, 308 U. S. 371, 374 (1940); see also *Lemon* v. *Kurtzman*, 411 U. S. 192, 199 (1973) (plurality opinion), and that to apply the new rule to parties who relied on the old would offend basic notions of justice and fairness. But this equitable method has its own drawback: it tends to relax the force of precedent, by minimizing the costs of overruling, and thereby allows the courts to act with a freedom comparable to that of legislatures. See *United States* v. *Johnson*, 457 U. S. 537, 554–555

(1982); *James* v. *United States*, 366 U. S. 213, 225 (1961) (Black, J., dissenting).

Finally, a court may apply a new rule in the case in which it is pronounced, then return to the old one with respect to all others arising on facts predating the pronouncement. This method, which we may call modified, or selective, prospectivity, enjoyed its temporary ascendancy in the criminal law during a period in which the Court formulated new rules, prophylactic or otherwise, to insure protection of the rights of the accused. See, *e. g., Johnson* v. *New Jersey*, 384 U. S. 719 (1966); *Stovall* v. *Denno*, 388 U. S. 293, 297 (1967); *Daniel* v. *Louisiana*, 420 U. S. 31 (1975); see also *Smith, supra*, at 198 ("During the period in which much of our retroactivity doctrine evolved, most of the Court's new rules of criminal procedure had expanded the protections available to criminal defendants"). On the one hand, full retroactive application of holdings such as those announced in *Miranda* v. *Arizona*, 384 U. S. 436 (1966); *Escobedo* v. *Illinois*, 378 U. S. 478 (1964); and *Katz* v. *United States*, 389 U. S. 347 (1967), would have "seriously disrupt[ed] the administration of our criminal laws [,] . . . requir[ing] the retrial or release of numerous prisoners found guilty by trustworthy evidence in conformity with previously announced constitutional standards." *Johnson, supra*, at 731. On the other hand, retroactive application could hardly have been denied the litigant in the law-changing decision itself. A criminal defendant usually seeks one thing only on appeal, the reversal of his conviction; future application would provide little in the way of solace. In this context, without retroactivity at least to the first successful litigant, the incentive to seek review would be diluted if not lost altogether.

But selective prospectivity also breaches the principle that litigants in similar situations should be treated the same, a fundamental component of *stare decisis* and the rule of law generally. See R. Wasserstrom, The Judicial Decision 69–72 (1961). "We depart from this basic judicial tradi-

tion when we simply pick and choose from among similarly situated defendants those who alone will receive the benefit of a 'new' rule of constitutional law." *Desist* v. *United States*, 394 U. S. 244, 258–259 (1969) (Harlan, J., dissenting); see also Von Moschzisker, Stare Decisis in Courts of Last Resort, 37 Harv. L. Rev. 409, 425 (1924). For this reason, we abandoned the possibility of selective prospectivity in the criminal context in *Griffith* v. *Kentucky*, 479 U. S. 314, 328 (1987), even where the new rule constituted a "clear break" with previous law, in favor of completely retroactive application of all decisions to cases pending on direct review. Though *Griffith* was held not to dispose of the matter of civil retroactivity, see *id.*, at 322, n. 8, selective prospectivity appears never to have been endorsed in the civil context. *Smith*, 496 U. S., at 200 (plurality opinion). This case presents the issue.

## III

Both parties have assumed the applicability of the *Chevron Oil* test, under which the Court has accepted prospectivity (whether in the choice-of-law or remedial sense, it is not clear) where a decision displaces a principle of law on which reliance may reasonably have been placed, and where prospectivity is on balance warranted by its effect on the operation of the new rule and by the inequities that might otherwise result from retroactive application. See *Chevron Oil*, 404 U. S., at 106–107. But we have never employed *Chevron Oil* to the end of modified civil prospectivity.

The issue is posed by the scope of our disposition in *Bacchus*. In most decisions of this Court, retroactivity both as to choice of law and as to remedy goes without saying. Although the taxpaying appellants prevailed on the merits of their Commerce Clause claim, however, the *Bacchus* Court did not grant outright their request for a refund of taxes paid under the law found unconstitutional. Instead, we remanded the case for consideration of the State's arguments that appellants were "not entitled to refunds since they did

not bear the economic incidence of the tax but passed it on as a separate addition to the price that their customers were legally obligated to pay." *Bacchus*, 468 U. S., at 276–277. "These refund issues, . . . essentially issues of remedy," had not been adequately developed on the record nor passed upon by the state courts below, and their consideration may have been intertwined with, or obviated by, matters of state law. *Id.*, at 277.

Questions of remedy aside, *Bacchus* is fairly read to hold as a choice of law that its rule should apply retroactively to the litigants then before the Court. Because the *Bacchus* opinion did not reserve the question whether its holding should be applied to the parties before it, cf. *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266, 297–298 (1987) (remanding case to consider whether ruling "should be applied retroactively and to decide other remedial issues"), it is properly understood to have followed the normal rule of retroactive application in civil cases. If the Court were to have found prospectivity as a choice-of-law matter, there would have been no need to consider the pass-through defense; if the Court had reserved the issue, the terms of the remand to consider "remedial" issues would have been incomplete. Indeed, any consideration of remedial issues necessarily implies that the precedential question has been settled to the effect that the rule of law will apply to the parties before the Court. See *McKesson*, 496 U. S., at 46–49 (pass-through defense considered as remedial question). Because the Court in *Bacchus* remanded the case solely for consideration of the pass-through defense, it thus should be read as having retroactively applied the rule there decided.[2] See also *Williams* v.

---

[2] In fact, the state defendant in *Bacchus* argued for pure prospectivity under the criteria set forth in *Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971). See Brief for Appellee in *Bacchus Imports Ltd.* v. *Dias*, O. T. 1983, No. 82–1565, p. 19. It went on to argue that *"even if"* the challenged tax were held invalid *and* the decision were not limited to prospective application, the challengers should not be entitled to refunds because

*Vermont,* 472 U. S. 14, 28 (1985); *Exxon Corp.* v. *Eagerton,* 462 U. S. 176, 196–197 (1983); cf. *Davis* v. *Michigan Dept. of Treasury,* 489 U. S. 803, 817 (1989).

*Bacchus* thus applied its own rule, just as if it had reversed and remanded without further ado, and yet of course the Georgia courts refused to apply that rule with respect to the litigants in this case. Thus, the question is whether it is error to refuse to apply a rule of federal law retroactively after the case announcing the rule has already done so. We hold that it is, principles of equality and *stare decisis* here prevailing over any claim based on a *Chevron Oil* analysis.

*Griffith* cannot be confined to the criminal law. Its equality principle, that similarly situated litigants should be treated the same, carries comparable force in the civil context. See *Estate of Donnelly,* 397 U. S., at 296 (Harlan, J., concurring). Its strength is in fact greater in the latter sphere. With respect to retroactivity in criminal cases, there remains even now the disparate treatment of those cases that come to the Court directly and those that come here in collateral proceedings. See *Griffith, supra,* at 331–332 (WHITE, J., dissenting). Whereas *Griffith* held that new rules must apply retroactively to all criminal cases pending on direct review, we have since concluded that new rules will not relate back to convictions challenged on habeas corpus. *Teague* v. *Lane,* 489 U. S. 288 (1989). No such difficulty exists in the civil arena, in which there is little opportunity for collateral attack of final judgments.

Nor is selective prospectivity necessary to maintain incentives to litigate in the civil context as it may have been in the criminal before *Griffith*'s rule of absolute retroactivity. In the civil context, "even a party who is deprived of the full ret-

---

any taxes paid would have been passed through to consumers. *Id.,* at 46. Though unnecessary to our ruling here, the prospectivity issue can thus be said actually to have been litigated and by implication actually to have been decided by the Court by the fact of its consideration of the pass-through defense. See *Clemons* v. *Mississippi,* 494 U. S. 738, 747–748, n. 3 (1990).

roactive benefit of a new decision may receive some relief." *Smith*, 496 U. S., at 198–199. Had the appellants in *Bacchus* lost their bid for retroactivity, for example, they would nonetheless have won protection from the future imposition of discriminatory taxes, and the same goes for the petitioner here. Assuming that pure prospectivity may be had at all, moreover, its scope must necessarily be limited to a small number of cases; its possibility is therefore unlikely to deter the broad class of prospective challengers of civil precedent. See generally Currier, Time and Change in Judge-Made Law: Prospective Overruling, 51 Va. L. Rev. 201, 215 (1965).

Of course, retroactivity in civil cases must be limited by the need for finality, see *Chicot County Drainage Dist.* v. *Baxter State Bank*, 308 U. S. 371 (1940); once suit is barred by res judicata or by statutes of limitation or repose, a new rule cannot reopen the door already closed. It is true that one might deem the distinction arbitrary, just as some have done in the criminal context with respect to the distinction between direct review and habeas: why should someone whose failure has otherwise become final not enjoy the next day's new rule, from which victory would otherwise spring? It is also objected that in civil cases unlike criminal there is more potential for litigants to freeload on those without whose labor the new rule would never have come into being. (Criminal defendants are already potential litigants by virtue of their offense, and invoke retroactivity only by way of defense; civil beneficiaries of new rules may become litigants as a result of the law change alone, and use it as a weapon.) That is true of the petitioner now before us, which did not challenge the Georgia law until after its fellow liquor distributors had won their battle in *Bacchus*. To apply the rule of *Bacchus* to the parties in that case but not in this one would not, therefore, provoke Justice Harlan's attack on modified prospectivity as "[s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a

stream of similar cases to flow by unaffected by that new rule." *Mackey*, 401 U. S., at 679 (opinion concurring in judgments in part and dissenting in part); see also *Smith*, *supra*, at 214–215 (STEVENS, J., dissenting). Beam had yet to enter the waters at the time of our decision in *Bacchus*, and yet we give it *Bacchus'* benefit. Insofar as equality drives us, it might be argued that the new rule should be applied to those who had toiled and failed, but whose claims are now precluded by res judicata; and that it should not be applied to those who only exploit others' efforts by litigating in the new rule's wake.

As to the former, independent interests are at stake; and with respect to the latter, the distinction would be too readily and unnecessarily overcome. While those whose claims have been adjudicated may seek equality, a second chance for them could only be purchased at the expense of another principle. " 'Public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of that contest, and that matters once tried shall be considered forever settled as between the parties.' " *Federated Department Stores, Inc.* v. *Moitie*, 452 U. S. 394, 401 (1981) (quoting *Baldwin* v. *Iowa State Traveling Men's Assn.*, 283 U. S. 522, 525 (1931)). Finality must thus delimit equality in a temporal sense, and we must accept as a fact that the argument for uniformity loses force over time. As for the putative hangers-on, they are merely asserting a right that the Court has told them is theirs in law, that the Court has not deemed necessary to apply on a prospective basis only, and that is not otherwise barred by state procedural requirements. They cannot be characterized as freeloaders any more than those who seek vindication under a new rule on facts arising after the rule's announcement. Those in each class rely on the labors of the first successful litigant. We might, of course, limit retroactive application to those who at least tried to fight their own battles by litigating before victory was certain. To this possibility, it is

enough to say that distinguishing between those with cases pending and those without would only serve to encourage the filing of replicative suits when this or any other appellate court created the possibility of a new rule by taking a case for review.

Nor, finally, are litigants to be distinguished for choice-of-law purposes on the particular equities of their claims to prospectivity: whether they actually relied on the old rule and how they would suffer from retroactive application of the new. It is simply in the nature of precedent, as a necessary component of any system that aspires to fairness and equality, that the substantive law will not shift and spring on such a basis. To this extent, our decision here does limit the possible applications of the *Chevron Oil* analysis, however irrelevant *Chevron Oil* may otherwise be to this case. Because the rejection of modified prospectivity precludes retroactive application of a new rule to some litigants when it is not applied to others, the *Chevron Oil* test cannot determine the choice of law by relying on the equities of the particular case. See *Simpson* v. *Director, Office of Workers' Compensation Programs, United States Dept. of Labor*, 681 F. 2d 81, 85–86 (CA1 1982), cert. denied *sub nom. Bath Iron Works Corp.* v. *Director, Office of Workers' Compensation Programs, United States Dept. of Labor*, 459 U. S. 1127 (1983); see also Note, 1985 U. Ill. L. Rev. 117, 131–132. Once retroactive application is chosen for any assertedly new rule, it is chosen for all others who might seek its prospective application. The applicability of rules of law is not to be switched on and off according to individual hardship; allowing relitigation of choice-of-law issues would only compound the challenge to the stabilizing purpose of precedent posed in the first instance by the very development of "new" rules. Of course, the generalized enquiry permits litigants to assert, and the courts to consider, the equitable and reliance interests of parties absent but similarly situated. Conversely, nothing we

say here precludes consideration of individual equities when deciding remedial issues in particular cases.

## IV

The grounds for our decision today are narrow. They are confined entirely to an issue of choice of law: when the Court has applied a rule of law to the litigants in one case it must do so with respect to all others not barred by procedural requirements or res judicata. We do not speculate as to the bounds or propriety of pure prospectivity.

Nor do we speculate about the remedy that may be appropriate in this case; remedial issues were neither considered below nor argued to this Court, save for an effort by petitioner to buttress its claim by reference to our decision last Term in *McKesson*. As we have observed repeatedly, federal "issues of remedy . . . may well be intertwined with, or their consideration obviated by, issues of state law." *Bacchus*, 468 U. S., at 277. Nothing we say here deprives respondents of their opportunity to raise procedural bars to recovery under state law or demonstrate reliance interests entitled to consideration in determining the nature of the remedy that must be provided, a matter with which *McKesson* did not deal. See *Estate of Donnelly*, 397 U. S., at 296 (Harlan, J., concurring); cf. *Lemon*, 411 U. S., at 203.

The judgment is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

JUSTICE WHITE, concurring in the judgment.

I agree with JUSTICE SOUTER that the opinion in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), may reasonably be read as extending the benefit of the judgment in that case to the appellant Bacchus Imports. I also agree that the decision is to be applied to other litigants whose cases were not final at the time of the *Bacchus* decision. This would be true under any one of several suppositions. First, if the Court in that case thought its decision to have been reasonably fore-

seeable and hence not a new rule, there would be no doubt that it would be retroactive to all similarly situated litigants. *Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971), would not then have been implicated. Second, even if retroactivity depended upon consideration of the *Chevron Oil* factors, the Court may have thought that retroactive application was proper. Here, it should be noted that although the dissenters in *Bacchus*—including JUSTICE O'CONNOR—argued that the Court erred in deciding the Twenty-first Amendment issue against the State, they did not argue that the Court erred in giving the appellant the benefit of its decision. *Bacchus, supra*, at 278 (STEVENS, J., dissenting). Third, even if—as JUSTICE O'CONNOR now argues—the Court was quite wrong in doing so, *post*, at 553–559, that is water over the dam, irretrievably it seems to me. There being no precedent in civil cases applying a new rule to the parties in the case but not to others similarly situated,* and *Griffith* v. *Kentucky*, 479 U. S. 314, 328 (1987), having overruled such a practice in criminal cases (a decision from which I dissented and still believe wrong, but which I now follow on the basis of *stare decisis*), I agree that the petitioner here should have the benefit of *Bacchus*, just as Bacchus Imports did. Hence I concur in the judgment of the Court.

Nothing in the above, however, is meant to suggest that I retreat from those opinions filed in this Court which I wrote or joined holding or recognizing that in proper cases a new rule announced by the Court will not be applied retroactively, even to the parties before the Court. See, *e. g., Cipriano* v. *City of Houma*, 395 U. S. 701, 706 (1969). This

---

*See *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 88 (1982); *Buckley* v. *Valeo*, 424 U. S. 1, 142–143 (1976); *Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971); *Cipriano* v. *City of Houma*, 395 U. S. 701, 706 (1969); *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 572 (1969); *Simpson* v. *Union Oil Co.*, 377 U. S. 13, 24–25 (1964); *England* v. *Louisiana State Bd. of Medical Examiners*, 375 U. S. 411, 422 (1964); *Chicot County Drainage Dist.* v. *Baxter State Bank*, 308 U. S. 371, 374 (1940).

was what Justice Stewart wrote for the Court in *Chevron Oil*, summarizing what was deemed to be the essence of those cases. *Chevron Oil, supra,* at 105–109. This was also what JUSTICE O'CONNOR wrote for the plurality in *American Trucking Assns., Inc.* v. *Smith,* 496 U. S. 167 (1990). I joined that opinion and would not depart from it. Nor, without overruling *Chevron Oil* and those other cases before and after *Chevron Oil,* holding that certain decisions will be applied prospectively only, can anyone sensibly insist on automatic retroactivity for any and all judicial decisions in the federal system.

Hence, I do not understand how JUSTICE SOUTER can cite the cases on prospective operation, *ante,* at 536–537, and yet say that he need not speculate as to the propriety of pure prospectivity, *ante,* at 544. The propriety of prospective application of decision in this Court, in both constitutional and statutory cases, is settled by our prior decisions. To nevertheless "speculate" about the issue is only to suggest that there may come a time when our precedents on the issue will be overturned.

Plainly enough, JUSTICES SCALIA, MARSHALL, and BLACKMUN would depart from our precedents. JUSTICE SCALIA would do so for two reasons, as I read him. *Post,* p. 548. First, even though the Justice is not naive enough (nor does he think the Framers were naive enough) to be unaware that judges in a real sense "make" law, he suggests that judges (in an unreal sense, I suppose) should never concede that they do and must claim that they do no more than discover it, hence suggesting that there are citizens who are naive enough to believe them. Second, JUSTICE SCALIA, fearful of our ability and that of other judges to resist the temptation to overrule prior cases, would maximize the injury to the public interest when overruling occurs, which would tend to deter them from departing from established precedent.

I am quite unpersuaded by this line of reasoning and hence concur in the judgment on the narrower ground employed by JUSTICE SOUTER.

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL and JUSTICE SCALIA join, concurring in the judgment.

I join JUSTICE SCALIA's opinion because I agree that failure to apply a newly declared constitutional rule to cases pending on direct review violates basic norms of constitutional adjudication. It seems to me that our decision in *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), makes clear that this Court's function in articulating new rules of decision must comport with its duty to decide only "Cases" and "Controversies." See U. S. Const., Art. III, § 2, cl. 1. Unlike a legislature, we do not promulgate new rules to "be applied prospectively only," as the dissent, *post*, at 550, and perhaps JUSTICE SOUTER, would have it. The nature of judicial review constrains us to consider the case that is actually before us, and, if it requires us to announce a new rule, to do so in the context of the case and apply it to the parties who brought us the case to decide. To do otherwise is to warp the role that we, as judges, play in a Government of limited powers.

I do not read JUSTICE SCALIA's comments on the division of federal powers to reject the idea expressed so well by the last Justice Harlan that selective application of new rules violates the principle of treating similarly situated defendants the same. See *Mackey* v. *United States*, 401 U. S. 667, 678–679 (1971), and *Desist* v. *United States*, 394 U. S. 244, 258–259 (1969) (dissenting opinion), on which *Griffith* relied. This rule, which we have characterized as a question of equity, is not the remedial equity that the dissent seems to believe can trump the role of adjudication in our constitutional scheme. See *post*, at 550–551. It derives from the integrity of judicial review, which does not justify applying principles determined to be wrong to litigants who are in or may still

come to court. We fulfill our judicial responsibility by requiring retroactive application of each new rule we announce.

Application of new decisional rules does not thwart the principles of *stare decisis*, as the dissent suggests. See *post*, at 552. The doctrine of *stare decisis* profoundly serves important purposes in our legal system. Nearly a half century ago, Justice Roberts cautioned: "Respect for tribunals must fall when the bar and the public come to understand that nothing that has been said in prior adjudication has force in a current controversy." *Mahnich* v. *Southern S. S. Co.*, 321 U. S. 96, 113 (1944) (dissenting opinion). The present dissent's view of *stare decisis* would rob the doctrine of its vitality through eliminating the tension between the current controversy and the new rule. By announcing new rules prospectively or by applying them selectively, a court may dodge the *stare decisis* bullet by avoiding the disruption of settled expectations that otherwise prevents us from disturbing our settled precedents. Because it forces us to consider the disruption that our new decisional rules cause, retroactivity combines with *stare decisis* to prevent us from altering the law each time the opportunity presents itself.

Like JUSTICE SCALIA, I conclude that prospectivity, whether "selective" or "pure," breaches our obligation to discharge our constitutional function.

JUSTICE SCALIA, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in the judgment.

I think I agree, as an abstract matter, with JUSTICE SOUTER's reasoning, but that is not what leads me to agree with his conclusion. I would no more say that what he calls "selective prospectivity" is impermissible because it produces inequitable results than I would say that the coercion of confessions is impermissible for that reason. I believe that the one, like the other, is impermissible simply because it is not allowed by the Constitution. Deciding between a constitutional course and an unconstitutional one does not pose a question of choice of law.

If the division of federal powers central to the constitutional scheme is to succeed in its objective, it seems to me that the fundamental nature of those powers must be preserved as that nature was understood when the Constitution was enacted. The Executive, for example, in addition to "tak[ing] Care that the Laws be faithfully executed," Art. II, § 3, has no power to bind private conduct in areas not specifically committed to his control by Constitution or statute; such a perception of "[t]he Executive power" may be familiar to other legal systems, but is alien to our own. So also, I think, "[t]he judicial Power of the United States" conferred upon this Court and such inferior courts as Congress may establish, Art. III, § 1, must be deemed to be the judicial power as understood by our common-law tradition. That is the power "to say what the law is," *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803), not the power to change it. I am not so naive (nor do I think our forebears were) as to be unaware that judges in a real sense "make" law. But they make it *as judges make it*, which is to say *as though* they were "finding" it — discerning what the law *is*, rather than decreeing what it is today *changed to*, or what it will *tomorrow* be. Of course this mode of action poses "difficulties of a . . . practical sort," *ante*, at 536, when courts decide to overrule prior precedent. But those difficulties are one of the understood checks upon judicial lawmaking; to eliminate them is to render courts substantially more free to "make new law," and thus to alter in a fundamental way the assigned balance of responsibility and power among the three branches.

For this reason, and not reasons of equity, I would find both "selective prospectivity" and "pure prospectivity" beyond our power.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, dissenting.

The Court extends application of the new rule announced in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), retroactively to all parties, without consideration of the analysis

described in *Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971). JUSTICE SOUTER bases this determination on "principles of equality and *stare decisis.*" *Ante*, at 540. To my mind, both of these factors lead to precisely the opposite result.

JUSTICE BLACKMUN and JUSTICE SCALIA concur in the judgment of the Court but would abrogate completely the *Chevron Oil* inquiry and hold that all decisions must be applied retroactively in all cases. I explained last Term that such a rule ignores well-settled precedent in which this Court has refused repeatedly to apply new rules retroactively in civil cases. See *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167, 188–200 (plurality opinion). There is no need to repeat that discussion here. I reiterate, however, that precisely because this Court has "the power 'to say what the law is,' *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803)," *ante*, at 549 (SCALIA, J., concurring in judgment), when the Court changes its mind, the law changes with it. If the Court decides, in the context of a civil case or controversy, to change the law, it must make the subsequent determination whether the new law or the old is to apply to conduct occurring before the law-changing decision. *Chevron Oil* describes our long-established procedure for making this inquiry.

## I

I agree that the Court in *Bacchus* applied its rule retroactively to the parties before it. The *Bacchus* opinion is silent on the retroactivity question. Given that the usual course in cases before this Court is to apply the rule announced to the parties in the case, the most reasonable reading of silence is that the Court followed its customary practice.

The *Bacchus* Court erred in applying its rule retroactively. It did not employ the *Chevron Oil* analysis, but should have. Had it done so, the Court would have concluded that the *Bacchus* rule should be applied prospectively only. JUSTICE SOUTER today concludes that, even in the absence of an independent examination of retroactivity, once the Court applies

a new rule retroactively to the parties before it, it must thereafter apply the rule retroactively to everyone. I disagree. Without a determination that retroactivity is appropriate under *Chevron Oil*, neither equality nor *stare decisis* leads to this result.

As to "equality," JUSTICE SOUTER believes that it would be unfair to withhold the benefit of the new rule in *Bacchus* to litigants similarly situated to those who received the benefit in that case. *Ante*, at 537–538, 540. If JUSTICE SOUTER is concerned with fairness, he cannot ignore *Chevron Oil;* the purpose of the *Chevron Oil* test is to determine the equities of retroactive application of a new rule. See *Chevron Oil, supra*, at 107–108; *American Trucking, supra*, at 191. Had the *Bacchus* Court determined that retroactivity would be appropriate under *Chevron Oil*, or had this Court made that determination now, retroactive application would be fair. Where the *Chevron Oil* analysis indicates that retroactivity is not appropriate, however, just the opposite is true. If retroactive application was inequitable in *Bacchus* itself, the Court only hinders the cause of fairness by repeating the mistake. Because I conclude that the *Chevron Oil* test dictates that *Bacchus* not be applied retroactively, I would decline the Court's invitation to impose liability on every jurisdiction in the Nation that reasonably relied on pre-*Bacchus* law.

JUSTICE SOUTER also explains that "*stare decisis*" compels his result. *Ante*, at 540. By this, I assume he means that the retroactive application of the *Bacchus* rule to the parties in that case is itself a decision of the Court to which the Court should now defer in deciding the retroactivity question in this case. This is not a proper application of *stare decisis*. The Court in *Bacchus* applied its rule retroactively to the parties before it without any analysis of the issue. This tells us nothing about how this case—where the *Chevron Oil* question is squarely presented—should come out.

Contrary to JUSTICE SOUTER's assertions, *stare decisis* cuts the other way in this case. At its core, *stare decisis* al-

lows those affected by the law to order their affairs without fear that the established law upon which they rely will suddenly be pulled out from under them. A decision *not* to apply a new rule retroactively is based on principles of *stare decisis*. By not applying a law-changing decision retroactively, a court respects the settled expectations that have built up around the old law. See *American Trucking*, 496 U. S., at 197 (plurality opinion) ("[P]rospective overruling allows courts to respect the principle of *stare decisis* even when they are impelled to change the law in light of new understanding"); *id.*, at 205 (SCALIA, J., concurring in judgment) (imposition of retroactive liability on a litigant would "*upset that litigant's settled expectations* because the earlier decision for which *stare decisis* effect is claimed . . . overruled prior law. That would turn the doctrine of *stare decisis* against the very purpose for which it exists"). If a *Chevron Oil* analysis reveals, as it does, that retroactive application of *Bacchus* would unjustly undermine settled expectations, *stare decisis* dictates strongly against JUSTICE SOUTER's holding.

JUSTICE SOUTER purports to have restricted the application of *Chevron Oil* only to a limited extent. *Ante*, at 543. The effect appears to me far greater. JUSTICE SOUTER concludes that the *Chevron Oil* analysis, if ignored in answering the narrow question of retroactivity as to the parties to a particular case, must be ignored also in answering the far broader question of retroactivity as to all other parties. But it is precisely in determining general retroactivity that the *Chevron Oil* test is most needed; the broader the potential reach of a new rule, the greater the potential disruption of settled expectations. The inquiry the Court summarized in *Chevron Oil* represents longstanding doctrine on the application of nonretroactivity to civil cases. See *American Trucking, supra*, at 188–200. JUSTICE SOUTER today ignores this well-established precedent and seriously curtails the *Chevron Oil* inquiry. His reliance upon *stare decisis* in reaching this conclusion becomes all the more ironic.

## II

Faithful to this Court's decisions, the Georgia Supreme Court in this case applied the analysis described in *Chevron Oil* in deciding the retroactivity question before it. Subsequently, this Court has gone out of its way to ignore that analysis. A proper application of *Chevron Oil* demonstrates, however, that *Bacchus* should not be applied retroactively.

*Chevron Oil* describes a three-part inquiry in determining whether a decision of this Court will have prospective effect only:

> "First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, . . . we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation. Finally, we [must] weig[h] the inequity imposed by retroactive application, for [w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the injustice or hardship by a holding of nonretroactivity." 404 U. S., at 106–107 (citations and internal quotation marks omitted).

*Bacchus* easily meets the first criterion. That case considered a Hawaii excise tax on alcohol sales that exempted certain locally produced liquor. The Court held that the tax, by discriminating in favor of local products, violated the Commerce Clause, U. S. Const., Art. I, § 8, cl. 3, by interfering with interstate commerce. 468 U. S., at 273. The Court rejected the State's argument that any violation of ordinary Commerce Clause principles was, in the case of alcohol sales, overborne by the State's plenary powers under § 2 of the

Twenty-first Amendment to the United States Constitution. That section provides:

"The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

The Court noted that language in some of our earlier opinions indicated that § 2 did indeed give the States broad power to establish the terms under which imported liquor might compete with domestic. See 468 U. S., at 274, and n. 13. Nonetheless, the Court concluded that other cases had by then established that "the [Twenty-first] Amendment did not entirely remove state regulation of alcoholic beverages from the ambit of the Commerce Clause." *Id.*, at 275. Relying on *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.*, 377 U. S. 324 (1964), *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980), and *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S. 691 (1984), the Court concluded that § 2 did not protect the State from liability for economic protectionism. 468 U. S., at 275–276.

The Court's conclusion in *Bacchus* was unprecedented. Beginning with *State Board of Equalization of California* v. *Young's Market Co.*, 299 U. S. 59 (1936), an uninterrupted line of authority from this Court held that States need not meet the strictures of the so-called "dormant" or "negative" Commerce Clause when regulating sales and importation of liquor within the State. *Young's Market* is directly on point. There, the Court rejected precisely the argument it eventually accepted in *Bacchus*. The California statute at issue in *Young's Market* imposed a license fee for the privilege of importing beer into the State. The Court concluded that "[p]rior to the Twenty-first Amendment it would obviously have been unconstitutional to have imposed any fee for that privilege" because doing so directly burdens interstate commerce. 299 U. S., at 62. Section 2 changed all of that. The Court answered appellees' assertion that § 2 did not ab-

rogate negative Commerce Clause restrictions. The contrast between this discussion and the Court's rule in *Bacchus* is stark:

"[Appellees] request us to construe the Amendment as saying, in effect: The State may prohibit the importation of intoxicating liquors provided it prohibits the manufacture and sale within its borders; but if it permits such manufacture and sale, it must let imported liquors compete with the domestic on equal terms. To say that, would involve not a construction of the Amendment, but a rewriting of it.

"The plaintiffs argue that, despite the Amendment, a State may not regulate importations except for the purpose of protecting the public health, safety or morals; and that the importer's license fee was not imposed to that end. Surely the State may adopt a lesser degree of regulation than total prohibition. Can it be doubted that a State might establish a state monopoly of the manufacture and sale of beer, and either prohibit all competing importations, or discourage importation by laying a heavy impost, or channelize desired importations by confining them to a single consignee?" *Id.*, at 62–63.

Numerous cases following *Young's Market* are to the same effect, recognizing the States' broad authority to regulate commerce in intoxicating beverages unconstrained by negative Commerce Clause restrictions. See, *e. g.*, *Ziffrin, Inc. v. Reeves*, 308 U. S. 132, 138 (1939); *United States v. Frankfort Distilleries, Inc.*, 324 U. S. 293, 299 (1945); *Joseph B. Seagram & Sons, Inc. v. Hostetter*, 384 U. S. 35, 42 (1966); *Heublein, Inc. v. South Carolina Tax Comm'n*, 409 U. S. 275, 283–284 (1972); see generally *Bacchus, supra*, at 281–282 (STEVENS, J., dissenting).

The cases that the *Bacchus* Court cited in support of its new rule in fact provided no notice whatsoever of the impending change. *Idlewild*, *Midcal*, and *Capital Cities, supra*, all involved States' authority to regulate the sale and importa-

tion of alcohol when doing so conflicted directly with legislation passed by Congress pursuant to its powers under the Commerce Clause. The Court in each case held that §2 did not give States the authority to override congressional legislation. These essentially were Supremacy Clause cases; in that context, the Court concluded that the Twenty-first Amendment had not "repealed" the Commerce Clause. See *Idlewild, supra,* at 331–332; *Midcal, supra,* at 108–109; *Capital Cities, supra,* at 712–713.

These cases are irrelevant to *Bacchus* because they involved the relation between §2 and Congress' authority to legislate under the (positive) Commerce Clause. *Bacchus* and the *Young's Market* line concerned States' authority to regulate liquor unconstrained by the *negative* Commerce Clause in the absence of any congressional pronouncement. This distinction was clear from *Idlewild, Midcal,* and *Capital Cities* themselves. *Idlewild* and *Capital Cities* acknowledged explicitly that §2 trumps the negative Commerce Clause. See *Idlewild, supra,* at 330 ("'Since the Twenty-first Amendment, . . . the right of a state to prohibit or regulate the importation of intoxicating liquor is not limited by the commerce clause . . .'"), quoting *Indianapolis Brewing Co.* v. *Liquor Control Comm'n,* 305 U. S. 391, 394 (1939); *Capital Cities, supra,* at 712 ("'This Court's decisions . . . have confirmed that the [Twenty-first] Amendment primarily created an exception to the normal operation of the Commerce Clause.' . . . [Section] 2 reserves to the States power to impose burdens on interstate commerce in intoxicating liquor that, absent the Amendment, would clearly be invalid under the Commerce Clause"), quoting *Craig* v. *Boren,* 429 U. S. 190, 206 (1976).

In short, *Bacchus'* rule that the Commerce Clause places restrictions on state power under §2 in the absence of any congressional action came out of the blue. *Bacchus* overruled the *Young's Market* line in this regard and created a new rule. See *Bacchus,* 468 U. S., at 278–287 (STEVENS, J.,

dissenting) (explaining just how new the rule of that case was).

There is nothing in the nature of the *Bacchus* rule that dictates retroactive application. The negative Commerce Clause, which underlies that rule, prohibits States from interfering with interstate commerce. As to its application in *Bacchus*, that purpose is fully served if States are, from the date of that decision, prevented from enacting similar tax schemes. Petitioner James Beam argues that the purposes of the Commerce Clause will not be served fully unless *Bacchus* is applied retroactively. The company contends that retroactive application will further deter States from enacting such schemes. The argument fails. Before our decision in *Bacchus*, the State of Georgia was fully justified in believing that the tax at issue in this case did not violate the Commerce Clause. Indeed, before *Bacchus* it did not violate the Commerce Clause. The imposition of liability in hindsight against a State that, acting reasonably would do the same thing again, will prevent no unconstitutionality. See *American Trucking*, 496 U. S., at 180–181 (plurality opinion).

Precisely because *Bacchus* was so unprecedented, the equities weigh heavily against retroactive application of the rule announced in that case. "Where a State can easily foresee the invalidation of its tax statutes, its reliance interests may merit little concern . . . . By contrast, because the State cannot be expected to foresee that a decision of this Court would overturn established precedents, the inequity of unsettling actions taken in reliance on those precedents is apparent." *American Trucking, supra*, at 182 (plurality opinion). In this case, Georgia reasonably relied not only on the *Young's Market* line of cases from this Court, but a Georgia Supreme Court decision upholding the predecessor to the tax statute at issue. See *Scott* v. *Georgia*, 187 Ga. 702, 705, 2 S. E. 2d 65, 66 (1939), relying on *Young's Market* and *Indianapolis Brewing*.

Nor is there much to weigh in the balance. Before *Bacchus*, the legitimate expectation of James Beam and other liquor manufacturers was that they had to pay the tax here at issue and that it was constitutional. They made their business decisions accordingly. There is little hardship to these companies from not receiving a tax refund they had no reason to anticipate.

The equitable analysis of *Chevron Oil* places limitations on the liability that may be imposed on unsuspecting parties after this Court changes the law. James Beam claims that if *Bacchus* is applied retroactively, and the Georgia excise tax is declared to have been collected unconstitutionally from 1982 to 1984, the State owes the company a $2.4 million refund. App. 8. There are at least two identical refund actions pending in the Georgia courts. These plaintiffs seek refunds of almost $28 million. See *Heublein, Inc.* v. *Georgia*, Civ. Action No. 87–3542–6 (DeKalb Super. Ct., Apr. 24, 1987); *Joseph E. Seagram & Sons, Inc.* v. *Georgia*, Civ. Action No. 87–7070–8 (DeKalb Super. Ct., Sept. 4, 1987); Brief for Respondents 26, n. 8. The State estimates its total potential liability to all those taxed at $30 million. *Id.*, at 9. To impose on Georgia and the other States that reasonably relied on this Court's established precedent such extraordinary retroactive liability, at a time when most States are struggling to fund even the most basic services, is the height of unfairness.

We are not concerned here with a State that reaped an unconstitutional windfall from its taxpayers. Georgia collected in good faith what was at the time a constitutional tax. The Court now subjects the State to potentially devastating liability without fair warning. This burden will fall not on some corrupt state government, but ultimately on the blameless and unexpecting citizens of Georgia in the form of higher taxes and reduced benefits. Nothing in our jurisprudence compels that result; our traditional analysis of retroactivity dictates against it.

A fair application of the *Chevron Oil* analysis requires that *Bacchus* not be applied retroactively. It should not have been applied even to the parties in that case. That mistake was made. The Court today compounds the problem by imposing widespread liability on parties having no reason to expect it. This decision is made in the name of "equality" and "*stare decisis.*" By refusing to take into account the settled expectations of those who relied on this Court's established precedents, the Court's decision perverts the meaning of both those terms. I respectfully dissent.