949 F.2d 441
 138 L.R.R.M. (BNA) 2928, 292 U.S.App.D.C.
266, 60 USLW 2380,
120 Lab.Cas. P 11,013
 DISTRICT LODGE 64, INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS, AFL-CIO, and its Local
Lodges 883, 1088, and 1142, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Brown & Sharpe Manufacturing Co., Intervenor.
 No. 90-1503.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 12, 1991.
Decided Nov. 29, 1991.
 
 Petition for Review of an Order of the National Labor relations board.
 Marc B. Gursky, with whom Allison Beck and Mark Schneider were on the brief, for petitioner.
 Fred L. Cornnell, Jr., Attorney, N.L.R.B., with whom Jerry M. Hunter, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel and Peter Winkler, Supervisory Atty., N.L.R.B., were on the brief, for respondent. Judith A. Dowd, Attorney, N.L.R.B., also entered an appearance for respondent.
 William R. Powers, III, with whom Thomas C. Keeney was on the brief, for intervenor.
 Before: RUTH B. GINSBURG, SILBERMAN and WILLIAMS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 WILLIAMS, Circuit Judge:
 
 
 1
 Section 10(b) of the National Labor Relations Act specifies a six-month statute of limitations for unfair labor practice charges. It requires parties to file a charge with the National Labor Relations Board and to serve the charged party within six months of the alleged unfair labor practice:
 
 
 2
 [N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made....
 
 
 3
 29 U.S.C. § 160(b). In Ducane Heating Corp., 273 NLRB 1389 (1985), enforced without opinion, 785 F.2d 304 (4th Cir.1986), however, the Board adopted an additional time restriction in reliance on the policy underlying § 10(b), holding that if a charge is filed within the § 10(b) period but then dismissed, it may not be reinstated (by the Board's General Counsel) outside the § 10(b) period "absent special circumstances in which a respondent fraudulently conceals the operative facts underlying the alleged violation." 273 NLRB at 1390. The union attacks both the Ducane rule and its application here.
 
 
 4
 * * * * * *
 
 
 5
 The union represents about 1600 workers at the Kingston, R.I., plant of Brown & Sharpe Manufacturing Company, a maker of machine tools. Its unfair labor practice charges arise out of a prolonged course of negotiations preceding a strike that began on October 18, 1981. The parties had failed to reach agreement on two key issues: the prevailing noncontractual practice of "job preference" or "machine seniority", under which employees could exercise their seniority to obtain an assignment to a specific job or machine in their group; and "mandatory transfers", a provision in the collective bargaining agreement that prohibited the company from transferring employees without their permission.
 
 
 6
 The union filed two sets of timely unfair labor practice charges, one on November 5, 1981 and another on March 18, 1982, alleging that Brown & Sharpe had failed to bargain in good faith in violation of §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (5). In each case, the General Counsel dismissed the charges, initially through his Regional Director and then on appeal through his national Office of Appeals. On June 30, 1982, after the final dismissal of both charges, the union learned that David Waterman, the former Director of Industrial Relations at Brown & Sharpe, had sued the company for wrongful discharge, claiming that he had been fired for refusing to commit unfair labor practices. Relying mainly on Waterman's allegations, the union filed a third charge on September 29, 1982, alleging that the company had fired Waterman for refusing to "carry out a bargaining position designed to preclude reaching agreement", J.A. 14, thus asserting a theory of "surface bargaining". After various procedural ups and downs, the General Counsel's Regional Director pursued the Waterman leads and secured copies of company committee minutes and position papers on bargaining strategy. Relying on these discoveries, the Board's General Counsel reinstated the earlier charges and issued a complaint on December 7, 1983.
 
 
 7
 When hearings began in 1984, Brown & Sharpe moved to dismiss the portion of the complaint containing the reinstated charges on the ground that the General Counsel had dismissed those charges and had not reinstated them until after expiration of § 10(b)'s six-month period. The ALJ reserved decision on the motion, and, while the company's special appeal from that order was pending, the Board issued its Ducane decision. Two weeks later the Board remanded the case to the ALJ for reconsideration in the light of Ducane. In April 1986 the ALJ found that Ducane required dismissal because the reinstatement occurred long after the running of § 10(b)'s six months. He also found that there was no evidence of fraudulent concealment. The ALJ conducted a hearing on some remaining charges in the complaint, but dismissed them on the merits in April 1989.
 
 
 8
 The Board affirmed, but did not rest on the ALJ's finding that there had been no fraudulent concealment. Instead, it found that the allegedly concealed evidence did not constitute "operative facts" because "even viewing the evidence in a light most favorable to the General Counsel's position, it does not support a finding that the Respondent advanced proposals as genuine absolutes when it actually did not consider the proposals to be important to its operations." J.A. at 153.
 
 
 9
 The union challenges the validity of Ducane itself, the Board's retroactive application of the doctrine, and the Board's explanation of its application here. We hold that Ducane is a reasonable implementation of the policy behind § 10(b) and that the Board was free to apply it retroactively. We remand the case to the Board, however, to explain its application of the fraudulent concealment exception.
 
 
 10
 * * * * * *
 
 
 11
 Although the union frames its attack on Ducane obscurely, it appears to contend that the doctrine is outside the scope of the Board's authority under § 10(b). By its terms that section only bars complaints based on claims that the charging party filed beyond the six-month period; once that limit is observed, as it was here, § 10(b) says nothing to limit the General Counsel 's authority to issue a complaint. While conceding that § 10(b) would not prohibit the Board from adopting a laches policy, the union nonetheless suggests that § 10(b) prevents the Board from adopting a fixed six-month limitation on the reinstatement of dismissed charges. Petitioner's Brief at 25 & n. 7.
 
 
 12
 The statute's silence, however, clearly means that Congress has not "directly spoken to the precise question at issue", Chevron USA Inc. v. NRDC, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), so that the Board is free to adopt any reasonable construction of the Act, id. at 842-43, 104 S.Ct. at 2781-82. See also NLRB v. United Food & Commercial Workers Union, 484 U.S. 112, 123, 108 S.Ct. 413, 420, 98 L.Ed.2d 429 (1987); Bentson Contracting Co. v. NLRB, 941 F.2d 1262, 1264 n. 2 (D.C.Cir.1991) (construing § 10(b)). Thus, our observation in Mourning v. NLRB, 505 F.2d 421 (D.C.Cir.1974), that " § 10(b) puts a statute of limitations on the actions of the charging party (six months) and not on the General Counsel", id. at 424 n. 10 (emphasis in original), merely restates the point that § 10(b) does not address delay by the General Counsel, much less his dismissal and reinstatement of a charge. Indeed, in Mourning we specifically suggested that the Board was free to adopt a laches policy but said that we would not assume it had done so without a clearer statement from the Board. Id. at 424.
 
 
 13
 The union also relies on § 3(d) of the Act, 29 U.S.C. § 153(d), which states that the General Counsel "shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under [§ 10], and in respect of the prosecution of such complaints before the Board". But § 3(d) says nothing about the Board's authority to dismiss a reinstated complaint as time-barred. The purpose of § 3(d) was to separate the Board's prosecutorial and adjudicative functions. See generally NLRB v. United Food & Commercial Workers Union, 484 U.S. at 117-18, 124-25, 108 S.Ct. at 417-18, 421-22 (discussing legislative history and contemporaneous agency interpretation). The Ducane rule interferes with the General Counsel's prosecutorial independence in substantially the same (permissible) way as does a substantive ruling of the Board as to what constitutes an unfair labor practice; it interferes a good deal less than do the Board's regulations dictating the procedures the General Counsel must follow in the investigation, withdrawal, dismissal, and settlement of charges and the issuance of complaints. See 29 CFR §§ 101.4-101.8. Furthermore, the union's extravagant reading of § 3(d) would bar the Board from adopting a laches policy, which the union itself concedes is permissible.
 
 
 14
 Thus neither § 10(b) nor any other provision of the Act addresses the issue of time limits on revival of a dismissed charge. Under Chevron the Board may fill this "gap" in the statutory scheme pursuant to its authority to implement that scheme. See 467 U.S. at 843-44, 104 S.Ct. at 2781-82. It may do so either by rulemaking under § 6 of the Act, 29 U.S.C. § 156, see 29 CFR §§ 101.1-101.43, or--as in Ducane--by adjudication, see, e.g., Redd-I Inc., 290 NLRB No. 140 (1988) (reaffirming that amendments "closely related" to original charge relate back to date of original complaint), approved in Sonicraft, Inc. v. NLRB, 905 F.2d 146, 148-49 (7th Cir.1990); Forrest Industries, Inc., 168 NLRB 732 (1967) (limiting charging parties to one motion for reconsideration of General Counsel decisions). The choice between rulemaking and adjudication is up to the Board. See NLRB v. Bell Aerospace Co., 416 U.S. 267, 291-95, 94 S.Ct. 1757, 1770-72, 40 L.Ed.2d 134 (1974).
 
 
 15
 The Board's decision to "borrow" a fixed period of limitations, rather than to adopt a laches rule, is also within its discretion under the Act. The legitimacy of such borrowing is clear from the longstanding federal court practice of selectively borrowing statutes of limitations to fill gaps in federal statutes containing no express limitations periods, even though in that context such interstitial lawmaking continues to be the subject of attack, see Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 157-70, 107 S.Ct. 2759, 2767-75, 97 L.Ed.2d 121 (1987) (Scalia, J., concurring). See generally Paul Bator, Paul Mishkin, Daniel Meltzer & David Shapiro, Hart & Wechsler's The Federal Courts and the Federal System 953-59 (3d ed. 1988). Indeed, the Supreme Court has borrowed § 10(b) itself to supply a time limit for employee suits against employers for breach of a collective bargaining agreement and against unions for breach of their fair representation duty. DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 154-55, 103 S.Ct. 2281, 2285-86, 76 L.Ed.2d 476 (1983). If a federal court might have borrowed § 10(b) here, surely the Board could do so under its undisputed authority to make policy decisions within the framework of the Act. Thus the Board's decision to treat dismissed charges as "disposed of and, in effect, ceas[ing] to exist" within the meaning of § 10(b), see Ducane, 273 NLRB at 1391 (footnote omitted), must be upheld if it is otherwise reasonable.
 
 
 16
 And we agree with the Board that Ducane reasonably promotes the policy of repose that § 10(b) contemplates. The rule gives charged parties "assur[ance] that, absent the existence of a properly served charge on file, [they] will not be liable for conduct occurring more than 6 months earlier," Ducane, 273 NLRB at 1391, and that they will not be called upon to defend themselves against stale charges " 'after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused' ". Local Lodge No. 1424, International Ass'n of Machinists v. NLRB, 362 U.S. 411, 419, 80 S.Ct. 822, 828, 4 L.Ed.2d 832 (1960) (quoting H.R.Rep. No. 245, 80th Cong., 1st Sess. 40 (1947)). The repose that Ducane assures also advances § 10(b)'s goal of "stabiliz[ing] existing bargaining relationships", Local Lodge No. 1424, 362 U.S. at 419, 80 S.Ct. at 828, enabling parties "to assess with relative certainty their obligations to each other", NLRB v. Preston H. Haskell Co., 616 F.2d 136, 142 (5th Cir.1980). For example, dismissal of a charge against a company for "dominat[ing] or interfer[ing]" with a union under § 8(a)(2), 29 U.S.C. § 158(a)(2), allows the company to negotiate with the union without fear that it will later be declared an invalid "company union". Similarly, dismissal of an employer's attack on a union's majority status under § 8(b)(4)(C), 29 U.S.C. § 158(b)(4)(C), and the passage of six months, will enable a union to negotiate a collective bargaining agreement without fear that the agreement might later be invalidated.[1]
 
 
 17
 The union notes gaps in Ducane 's protection against stale claims: the General Counsel's ability to wait an indefinite period before acting on a charge and Ducane 's exception for fraudulent concealment. It argues that because of these gaps the policy cannot achieve stability in labor relations. Obviously, however, an agency may adopt rules that fulfill their objectives only imperfectly, where statutory provisions or competing policy goals frustrate perfection.
 
 
 18
 At oral argument union counsel also argued that the Board could not reasonably invoke charged parties' interest in reliance on a dismissal, because at the time of the dismissals there was no Ducane rule signalling that reliance would be protected. Cf. Sonicraft, Inc. v. NLRB, 905 F.2d at 149 (whether dismissal of a charge has lulling effect depends on then-prevailing rule). It is quite true that in an abstract sense reliance interests are always circular; if the rule does not protect them, no one may reasonably rely. But that still leaves an agency free to foster reliance for policy goals, such as (here) the stabilization of labor relations.
 
 
 19
 Finally, although the union raises the point obscurely if at all, we do not read the Board's opinion in Ducane as resting on a mistaken view that § 10(b) required the Ducane policy. Compare Prill v. NLRB, 755 F.2d 941, 942, 956 (D.C.Cir.1985) (remanding where "Board failed to rely on its own judgment and expertise, and instead based its decision on an erroneous view of the law"). A couple of the Board's remarks in Ducane erroneously suggest that § 10(b) commands the decision: "[W]e would exceed our own authority were we to permit the General Counsel to ignore the statutory limitations proviso", Ducane, 273 NLRB at 1391; "We must ... 'restrike the balance established by Congress when it added the proviso to Section 10(b)' ", id. (quoting Winer Motors, Inc., 265 NLRB 1457, 1458 (1982)). Overall, however, we think the Ducane decision can fairly be read as adopting a policy in harmony with § 10(b) rather than construing the Act to require it. The Board's fundamental rationale was that reinstatement ten months after an alleged violation (as here) "contravened the purposes of the limitations proviso to Section 10(b) of the Act." Ducane, 273 NLRB at 1390 (emphasis added). The decision in effect extended Winer Motors, which applied § 10(b)'s six-month limit to reinstatement after withdrawal of a charge, to dismissal, reasoning that dismissal "by a government official well versed in the intricacies of labor law creates the impression on members of the public that the charge has been disposed of even more conclusively than ... when it is merely withdrawn." Id. at 1391 (footnote omitted). Considered in its entirety, then, the Board's opinion is fairly viewed as adopting one of several possible policy choices consistent with the purposes of the Act. See Bowman Transportation v. Arkansas-Best Freight System, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (court upholds "a decision of less than ideal clarity [where] the agency's path may reasonably be discerned").
 
 
 20
 * * * * * *
 
 
 21
 Although the Board applied Ducane retroactively to the parties in Ducane itself, the union argues that its application here has caused "manifest injustice" and was therefore improper under our decisions limiting agency authority to apply "new rules" retroactively. See Clark-Cowlitz Joint Operating Agency v. FERC, 826 F.2d 1074, 1081 (D.C.Cir.1987) (en banc); Retail, Wholesale & Department Store Union v. NLRB, 466 F.2d 380, 390 (D.C.Cir.1972). Whether Retail Union supplies the governing standard, as the union and Board assume, or James B. Beam Distilling Co. v. Georgia, --- U.S. ----, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), controls, as intervenor Brown & Sharpe argues, we uphold retroactive application.
 
 
 22
 Brown & Sharpe argues that Beam makes retroactive application of Ducane not merely permissible but required. There six justices agreed that federal courts must never apply "selective prospectivity" to their own decisions: if a federal court applies a new judicial rule to the parties in the case announcing the rule, it must do so in all other cases that come before it on direct appeal (even where the relevant conduct occurred before the case announcing the new rule). Whether Beam should apply to agency adjudications is unclear. Justice Souter's analysis, joined by Justice Stevens and seemingly adopted by Justice White, see id. at 2448-49 (White, J., embracing "pure prospectivity" but "concur[ring] in the judgment on the narrower ground employed by Justice Souter"), reasoned that selective prospectivity "breaches the principle that litigants in similar situations should be treated the same, a fundamental component of stare decisis and the rule of law generally," id. at 2444. This concern for equity and the rule of law would seem applicable to agency adjudications. Indeed, the agencies' parallel legislative power might be read to tilt the balance more strongly against allowing prospective adjudicative overrulings, as it provides agencies an alternative means for making radical changes prospectively. Cf. SEC v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947) (agencies' possession of rulemaking power means "less reason to rely upon ad hoc adjudication to formulate new standards of conduct"). In any case, Justices Blackmun, Scalia, and Marshall, in opinions by the first two, joined the judgment on the ground that Article III forecloses any prospectivity for federal adjudications, whether "pure" or "selective". See id. at 2449-50 (Blackmun, J., concurring in the judgment); id. at 2450-51 (Scalia, J., concurring in the judgment). These Article III grounds are inapplicable to administrative adjudications, so Beam does not clearly foreclose selective retroactivity here.
 
 
 23
 In any event, retroactive application of Ducane was proper under our prior precedents. We have commonly said that analysis of retroactivity for agency decisions required consideration of five factors:
 
 
 24
 (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.
 
 
 25
 Retail Union, 466 F.2d at 390 (quoted in Clark-Cowlitz, 826 F.2d at 1081 and Local 900, International Union of Electrical, Radio & Machine Workers v. NLRB, 727 F.2d 1184, 1194 (D.C.Cir.1984)). This test appears substantively indistinguishable from the standard for judicial retroactivity set forth in Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). That test required retroactivity unless (1) the decision creates a new rule, either by overruling past precedents relied upon by the parties or because it was an issue of first impression [paralleling Retail Union 's first and second factors], (2) retroactive application will be more likely to hinder than to further the operation of the new rule [paralleling Retail Union 's fifth factor]; and (3) retroactive application would produce "substantial inequitable results" [paralleling Retail Union 's third and fourth factors]. See Chevron Oil, 404 U.S. at 106-07, 92 S.Ct. at 355-56. For simplicity's sake, we follow the Chevron Oil sequence.
 
 
 26
 First, although Ducane did modify existing law, Board precedent was neither clear nor consistent during the time that the union's initial charges were still pending before the General Counsel, between November 5, 1981 (first charge filed) and June 16, 1982 (dismissal of second set became final). It is true that between 1977 and 1982, the Board interpreted § 3(d) of the Act as granting the General Counsel "virtually unlimited discretion" to reinstate dismissed charges based on "newly discovered evidence", even if reinstatement occurred outside the six-month limit of § 10(b). See California Pacific Signs, 233 NLRB 450, 451 (1977). Neither the union nor the General Counsel, however, can have reasonably regarded California Pacific Signs as settled law. As the Board itself has acknowledged, "consistency of rationale or result ... has not been a hallmark of the Board's treatment of these cases." Winer Motors, Inc., 265 NLRB at 1458 (footnotes omitted). Although there appear to be no pre-1977 cases involving reinstatement of dismissed charges, the Board had changed its position on the reinstatement of withdrawn charges[2] on several occasions from 1950 through 1977. Compare Koppers Co., 163 NLRB 517 (1967) (prohibiting the reinstatement of withdrawn charges after the § 10(b) period had expired); Square D Co., 105 NLRB 253 (1953) (same); Olin Industries, 97 NLRB 130 (1951) (same), with Silver Bakery, 150 NLRB 421, 424-25 (1964) (General Counsel "has virtually unlimited discretion to proceed on charges as he deems fit"), enforcement denied, 351 F.2d 37 (1st Cir.1965). Although Ducane involved dismissed and not withdrawn charges, the Board's extension of its doctrine to dismissals was not an extreme or unpredictable step. Indeed, as noted above, the Board reasonably argued in Ducane that parties may be more likely to impute finality to dismissal than to withdrawal. Thus, Ducane is not the sort of radical transformation whose retroactive application is likely to be unfair.
 
 
 27
 Second, retroactive application of Ducane seems likely to further the purposes of both rule and statute in the same measure as it will in future applications. Indeed, the union makes no argument to the contrary. Application clearly avoided the use of stale evidence, with the attendant risks of inaccuracy. It also tended to stabilize labor relations, at least from the time that the decision of Ducane itself made it likely that the dismissed charges were forever dead. Of course application of Ducane here means that possibly valid charges will lose without full consideration on their merits. But that is the consequence of any limitations or laches rule; once the Board has decided that the trade-off favors the time bar, there is no reason to delay the application.
 
 
 28
 Finally, we do not believe that retroactive application of Ducane will produce "substantial inequitable results". Not only do the Board's past vacillations weaken any basis for possible union reliance on pre-Ducane law, see, e.g., Local 900, 727 F.2d at 1195, but the union has failed to identify any likely type of reliance. Its opening brief asserted, "[c]learly, [the union] relied on" the prior policy, without specifying a single way in which it might have done so. Petitioner's Brief at 34. The Reply claimed that advance knowledge of the new rule would have affected "the timing of the Union's charge, the nature of the investigation, the request for an investigatory subpoena [that the union made after Waterman sued Brown & Sharpe in June 1982], and infinite other actions". Reply Brief at 8. The most concrete of these possibilities is the request for an investigatory subpoena. But how could foreknowledge of Ducane have led the union (or the Board's regional office) to make a request that would have been based on the Waterman revelations, before those revelations were made? The more general points seem to add up to a suggestion that the union and the General Counsel may have been somewhat easygoing in their investigations, with an expectation that the charges might be dismissed but with a vague hope of later revival. But the union offers no evidence to suggest any such reliance, which at best would not supply a compelling equitable claim--even assuming that retroactivity analysis is concerned with reliance on anything other than primary conduct. Cf. NLRB v. Bell Aerospace Co., 416 U.S. 267, 295, 94 S.Ct. 1757, 1772, 40 L.Ed.2d 134 (1974) (distinguishing cases "in which some new liability is sought to be imposed on individuals for past actions which were taken in good-faith reliance on Board actions"); NLRB v. Majestic Weaving Co., 355 F.2d 854, 860 (2d Cir.1966) (Friendly, J.); cf. also Payne v. Tennessee, --- U.S. ----, 111 S.Ct. 2597, 2610, 115 L.Ed.2d 720 (1991) (stare decisis is most important in "cases involving property and contract rights, where reliance interests are involved, [whereas] the opposite is true in cases ... involving procedural and evidentiary rules").
 
 
 29
 The union extends its retroactivity analysis to argue that retroactive application of Ducane--indeed, any application--would be unjust because the Board may not impose the "consequences of its own misfeasance" on the parties. Petitioner's Brief at 31, Reply Brief at 8. The cases it cites, NLRB v. J.H. Rutter-Rex Manufacturing Co., 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969) and NLRB v. International Ass'n of Bridge, Structural & Ornamental Ironworkers, 466 U.S. 720, 104 S.Ct. 2081, 80 L.Ed.2d 715 (1984), support no such proposition. Rather, in sustaining Board orders of back-pay that the Board's long delay had greatly increased, those decisions protected the Board from the courts of appeals' interferences with its discretion, reasoning that "the Board is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers." J.H. Rutter-Rex, 396 U.S. at 264-65, 90 S.Ct. at 421 (emphasis added) (quoted in Ironworkers, 466 U.S. at 725, 104 S.Ct. at 2084). Investigative foul-ups by the General Counsel necessarily burden one party or another (the charging party under Ducane, the charged party under its opposite); neither inequity is necessarily greater than the other, and it is within the Board's discretion to strike the balance as it has. Cf. Mourning v. NLRB, 505 F.2d at 424 n. 10.
 
 
 30
 Thus, assuming that we should still analyze the retroactivity of new rules created in agency adjudications under the multi-factor balancing invited by Retail Union and Chevron Oil, we find no reason here to interfere with the Board's decision.
 
 
 31
 * * * * * *
 
 
 32
 In dismissing the complaint, the ALJ found no basis to apply Ducane 's exception for the case in which "a respondent fraudulently conceals the operative facts underlying the alleged violation." 273 NLRB at 1390. He noted that Brown & Sharpe produced witnesses who sought to convince the Regional Director that it had bargained in good faith, and "provided, as requested, bargaining notes, correspondence, and the proposals and counterproposals". Although the company did not come forward with committee minutes or position papers, it had no duty to do so, for the investigator never requested them. J.A. at 96-98; 109-10.
 
 
 33
 The Board ignored this finding, so it is not under review. Instead the Board rested its affirmance on the ground that the new evidence did not amount to "operative facts" within the meaning of the exception. We are unable to make enough sense of the Board's opinion to justify affirmance without further explanation. See Greater Boston Television Corp. v. FCC, 444 F.2d 841, 851 (D.C.Cir.1970).
 
 
 34
 As a finding that the minutes and position papers, even if fraudulently concealed, did not amount to "operative facts", the Board's decision leaves completely obscure just how significant the facts must be. In considering federal statutes of limitations, we have said that "deliberate concealment of material facts" tolls the statute until the plaintiff discovers or with due diligence should have discovered the basis of the lawsuit. Fitzgerald v. Seamans, 553 F.2d 220, 228 (D.C.Cir.1977) (emphasis added). Of course the Board may wish to use another standard, and may well be free to do so. But it does not explicitly embrace any standard, and we find it hard to relate the Board's implicit standard to the facts.
 
 
 35
 Its core conclusion seemed to be that "the documents do not support the allegation [of] surface bargaining". J.A. 160. But even assuming the claim ultimately to be completely meritless, the Board's analysis itself points to some evidence supportive of the claim. For example, the Board notes that "the position paper on [mandatory] transfers states that managers have had very few problems with them." Id. at 159. This statement surely gives some support to the union view that treatment of mandatory transfers as an absolute was contrived, cf. Sign and Pictorial Union Local 1175 v. NLRB, 419 F.2d 726, 731 (D.C.Cir.1969), even if, on balance, a fact finder would conclude that the higher levels of Brown & Sharpe's management acted in good faith in rejecting the position paper's recommendation. Our inference that the Board was demanding a good deal more than "support" is reinforced by its remarks that particular pieces of evidence are not "inherently contradictory", see J.A. at 159-60, seeming to suggest that only an inexplicable contradiction would be enough, regardless of whether the company offered an explanation.
 
 
 36
 We might try to view the Board's opinion as a merits ruling--a finding that the allegedly concealed evidence (together with other evidence such as the Waterman testimony) did not amount to a violation of the Act. Several difficulties prevent our affirming on that ground. First, the Board appears not to have any procedure (equivalent to motions under Rule 12(b)(6) or Rule 56 of the Federal Rules of Civil Procedure) whereby it could consider the legal sufficiency of an unfair labor practice claim without a hearing before an ALJ. Rather, the Board reviews ALJ determinations made after hearing, evaluating the entire record, including the ALJ's factual findings. See 29 CFR § 101.12(a). Here there were no findings on the merits, as the ALJ had dismissed the case under Ducane. Moreover, had there been a merits hearing, opposing counsel would have had a chance to brief the merits before the Board. Id.
 
 
 37
 Second, even if some procedural equivalent to Rule 12(b)(6) or Rule 56 existed, the Board's decision does not seem to view the evidence in the light most favorable to the (hypothetical) non-moving party (the union), although the Board claimed that it had, see J.A. at 153. For example, we have already pointed to the Board's writing off some statements as not "inherently contradictory" of others; in doing so the Board (without any apparent support) seemed to dismiss inferences that might have been significant, especially if reinforced by Waterman's testimony. Indeed, the Board's complete disregard of what Waterman had said and might say is itself inconsistent with the analogy to Rule 12(b)(6) or Rule 56.
 
 
 38
 Thus we cannot sustain the Board's treatment of the fraudulent concealment exception. It is not a reasoned application of any intelligible standard, and as a finding that the charge was meritless it was not preceded by adherence to the necessary procedures.
 
 
 39
 * * * * * *
 
 
 40
 Accordingly, although we uphold both the Ducane rule and the Board's authority to apply it to a charge for which the period had already run, we remand the case to the Board for resolution of the fraudulent concealment issue.
 
 
 41
 So ordered.
 
 
 
 [1]
 The union's argument that the decision to dismiss a complaint is not "final" and therefore does not assure the parties that the case has been concluded is meritless. The Regional Director's decision to dismiss a complaint is appealable only to the General Counsel and not to the Board or the courts, 29 CFR §§ 101.6 & 102.19, so the General Counsel's denial of such an appeal is final. See, e.g., NLRB v. United Food & Commercial Workers Union, 484 U.S. at 118-19 & nn. 8 & 10, 108 S.Ct. at 418-19 & nn. 8 & 10; NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 138-39, 95 S.Ct. 1504, 1510-11, 44 L.Ed.2d 29 (1975)
 
 
 [2]
 "Withdrawn charges" are charges withdrawn by the charging party with the General Counsel's consent. Under the Board's rules, when the General Counsel believes that a complaint should not issue, he or she must first ask the charging party voluntarily to withdraw the charge; if the charging party refuses, then the General Counsel dismisses the charge. See 29 CFR §§ 101.5, 101.6