## NATIONAL FUEL GAS SUPPLY CORPORATION, Petitioner,

v.

## FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

### National Fuel Gas Distribution Corporation, et al., Intervenors.

No. 94–1307.

United States Court of Appeals, District of Columbia Circuit.

Argued April 10, 1995.

Decided July 18, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied Sept. 18, 1995.*

* Silberman and Henderson, Circuit Judges, did not participate in this order.

Mary E. Baluss argued the cause, for petitioner and intervenor Nat. Fuel Gas Distribution Corp. With her on the briefs were George L. Weber, for petitioner, and Kristine L. Delkus, for intervenor Nat. Fuel Gas Distribution Corp. Christopher J. Barr and S.D. Holbrook entered appearances for intervenor Nat. Fuel Gas Distribution Corp.

Eric L. Christensen, Atty., F.E.R.C., argued the cause, for respondent. With him on the briefs was Jerome M. Feit, Solicitor, F.E.R.C.

Robert H. Benna argued the cause, for intervenor Tennessee Gas Pipeline Co. With him on the briefs was Jeanne M. Bennett. Robert G. Kern entered an appearance.

Before EDWARDS, Chief Judge; BUCKLEY, and GINSBURG, Circuit Judges.

GINSBURG, Circuit Judge:

National Fuel Gas Supply Corporation petitions for review of the Federal Energy Regulatory Commission's decision retroactively to apply this court's vacatur of an

earlier Commission order allowing National to reduce its contractual obligation to purchase natural gas from the Tennessee Gas Pipeline Company. National argues that (1) the Commission's decision is arbitrary, capricious, and not the product of reasoned decision-making, and (2) the Commission should have held a formal hearing before making its decision. Finding no merit to either of those claims, we deny the petition for review.

## I. BACKGROUND

This case is only the latest episode in the saga of the Commission's efforts to introduce greater competition into the market for natural gas. Here we recount only those background facts necessary to an understanding of National's petition for review; for a more complete account of the events leading up to this case, see *Associated Gas Distributors v. FERC*, 824 F.2d 981, 993–97, 1013–21 (D.C.Cir.1987) (*AGD*), and *American Gas Association*, 888 F.2d 136, 142–46 (D.C.Cir. 1989) (*AGA*).

### A. Order No. 436 and National's Election

In Order No. 436, 50 Fed.Reg. 42,408 (1985), the Commission concluded that, by refusing to transport gas for producers with which they competed in the sale of gas, integrated pipelines often made it difficult for their customers (local distribution companies or LDCs) to purchase competitively priced gas. The Commission decided that competition would be increased if the pipelines "unbundled" their merchant and transportation services; it therefore created an incentive for a pipeline to provide "open access," *i.e.,* to transport gas upon a non-discriminatory basis.

The Commission also concluded that "open access" would have little impact upon competition in the market for gas if LDCs remained bound by their contractual commitments to purchase gas from the pipelines. Those contracts gave the LDC the right to demand, and obligated the pipeline to deliver, a certain quantity of natural gas per day (a/k/a the LDC's "contract demand" or CD); the LDC paid a "demand charge" regardless whether it took any gas and a "commodity charge" for such gas as it actually purchased.

As long as an LDC remained bound to pay the "demand charge," it would find the purchase of gas under its CD, for which it would pay only the "commodity charge," significantly less expensive than even competitively priced gas on the open market. Therefore, in order to assure a healthy demand for producers' gas, the Commission required that open-access pipelines allow each LDC customer: (1) to reduce its CD by a specified percentage; or (2) to convert the same percentage of its CD from gas purchase (*i.e.,* fully bundled service) to gas transportation alone.

When Order No. 436 issued on October 9, 1985, National was contractually obligated to purchase nearly 300,000 Dth/day of gas from Tennessee. On December 10, 1986 Tennessee opted to become an open access pipeline and shortly thereafter, on January 24, 1987, National elected to reduce its CD commitment to the maximum extent permitted by Order No. 436. Under the regulations promulgated in that order, the CD reduction would become effective 150 days after National's election, on June 23, 1987. *See* 18 C.F.R. § 284.10(c)(2)(i)(B) (1986).

### B. *AGD*, Order No. 500, and *AGA*

It was also on June 23, 1987, by coincidence, that this court held that Order No. 436 was unlawful in part. In particular, we held that the CD reduction and conversion provisions "suffer[ed] from a want of both legal authority and reasoned decision-making." *AGD*, 824 F.2d at 1044. Moreover, although the court approved much of the rest of Order No. 436, it concluded that the unlawful provisions could not be severed from the lawful provisions, and therefore vacated the order in its entirety. *Id.* at 981.

The Commission quickly moved to minimize the disruptive impact of the vacatur of Order No. 436. First, on July 2, 1987 the Commission asked this court for leave to stay the effective date of its regulations authorizing LDCs to adjust their CD until after the Commission issued a new order in lieu of Order No. 436. *See Regulation of Natural Gas Pipelines After Practical Wellhead Decontrol,* "Order Staying Effectiveness of

Regulations," FERC Stats. & Regs. (CCH) ¶ 30,754 at 30,745 (1987), which we granted on July 17, 1987. *AGD,* No. 85–1811 (D.C.Cir. July 17, 1987).

Second, on August 7, 1987 the Commission issued an interim rule, Order No. 500, 52 Fed.Reg. 30,334 (1987), which became effective upon this court's issuance of the *AGD* mandate on September 15, 1985. *See* 52 Fed.Reg. 35,539 (1987). Order No. 500 re-adopted most of Order No. 436, with various provisions added and deleted in an effort to respond, on an interim basis, to our decision in *AGD.* In particular, Order No. 500 retained the CD conversion provision of Order No. 436, but dropped the CD reduction option (while reserving the possibility that the Commission would revisit the subject).

Interpreting *AGD* and Order No. 500 as a retroactive vacatur of the CD reduction provision, Tennessee refused to recognize National's election to reduce its CD. Shortly thereafter, however, the Commission opined that CD reductions made prior to the issuance of Order No. 500 were still valid, unaffected either by our decision in *AGD* vacating Order No. 436 or by the Commission's issuance of Order No. 500. *See Interstate Power Co. v. Natural Gas Pipeline Co. of America,* 41 FERC ¶ 61,096, at 61,256 (Oct. 30, 1987), *reh'g denied,* 42 FERC ¶ 61,049 (1988).

More than two years after this court's decision in *AGD,* the Commission had not yet issued a final order to succeed interim Order No. 500 when this court heard the petitions for review of that order that a number of parties had filed. Tennessee, as one such party, argued that the Commission had erred in *Interstate:*

> [T]he Commission should have retroactively nullified customers' requests for CD reductions, because this court vacated, and the Commission then decided that it did not have adequate support in the record to repromulgate, the provision of Order No. 436 authorizing those reductions.

*Id.* at 136. Tennessee argued further that the Commission had failed to follow the only escape route from the general rule in civil cases that a judicial mandate has retroactive effect, *National Association of Broadcasters*

*v. FCC,* 554 F.2d 1118, 1130 (D.C.Cir.1976), namely the three-part test of *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–08, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971): (1) whether the decision announced "a new principle of law"; (2) whether non-retroactive application would undermine the purpose of that decision; and (3) whether retroactive application would work a significant inequity. *See AGA,* 888 F.2d at 150.

The court in *AGA* agreed with Tennessee that, in light of the Commission's acknowledgment in Order No. 500 that the record did not support its repromulgating the CD reduction provision, neither our order of July 17, 1987 permitting the FERC to stay the effective date of the CD adjustment regulations nor the Commission's own Order No. 500 made our invalidation of the CD reduction provision prospective-only. The court instructed the Commission that "in order to overcome the presumption that [this court's] vacatur of the CD reduction provision is to be applied retroactively," the agency would have to consider on remand the three factors identified by the Supreme Court in *Chevron Oil.*

### C. The Orders Under Review

On remand, the Commission promulgated *Order No. 500–H, Regulation of Natural Gas Pipelines After Practical Wellhead Decontrol,* 54 Fed.Reg. 52,344 (1989), to succeed interim Order No. 500. After considering public comments upon the question whether the CD reduction option should be reinstated, the Commission there "decided not to restore the CD reduction option generically in the final rule," although it "continue[d] to believe that the objectives of the CD reduction [were] valid." Turning then to the question whether our decision in *AGD* should be applied retroactively to invalidate CD reduction elections that had taken effect prior to its issuance, the Commission concluded that it lacked, and requested that Tennessee and the LDCs that had elected the CD reduction submit the information necessary to perform the *Chevron Oil* analysis.

### 1. The First Order

Tennessee and two of its customers (National and Columbia Gas Transmission Com-

pany) responded to the Commission's request. Reviewing their submissions, the Commission first noted that in response to its question whether a formal hearing was necessary, only Columbia had submitted an answer, and it said no. *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol (In re: Tennessee Gas Pipeline Company),* 50 FERC ¶ 61,174 at 61,499 (1990) (*The First Order*). The Commission "construe[d] the silence of Tennessee and National Fuel as indicating the same response," and therefore did not hold a hearing. *See id.* at 61,499. After applying the three *Chevron Oil* factors to the information submitted by the parties, the Commission concluded that the equities strongly favored Tennessee; it therefore applied *AGD* retroactively to vacate the CD reductions that National and Columbia had elected.

### 2. The Second Order

National sought rehearing. When the Commission reexamined its application of the *Chevron Oil* factors to National's case, the agency reversed its earlier conclusion that National's reliance upon the CD reduction provision was unreasonable. This time the Commission found that National had in fact relied upon the CD reduction option and that its reliance was detrimental because it caused that company to forego its opportunity to elect CD conversion on Tennessee. *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol (In re: Tennessee Gas Pipeline Company),* 56 FERC ¶ 61,412 at 62,484 (1991) (*The Second Order*). Deciding that National "should not be put in a worse position than if it had converted in the first place," *id.* at 62,494, the Commission ordered Tennessee to treat National's CD reduction as if it were a CD conversion. *Id.* at 62,495.

### 3. The Third Order

It was then Tennessee's turn to seek rehearing, for which it made two arguments. First, it argued that the Supreme Court had effectively overruled *Chevron Oil* in *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991); *Lampf, Pleva, Lipkind v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); and *Harper v. Virginia Dep't of Taxation,* —— U.S. ——, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). According to Tennessee, the Court had in those cases established a *per se* rule that a judicial decision (here *AGD*) is to be retroactively applied. In the alternative, Tennessee argued that the Commission misapplied *Chevron Oil* in the Second Order.

The Commission granted Tennessee's motion for rehearing in part, changed its direction once again, and vacated National's CD reduction. *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol (In re: Tennessee Gas Pipeline Company),* 64 FERC ¶ 61,119 at 61,119 (1993) (*Third Order*). With respect to Tennessee's argument that the Supreme Court had effectively overruled *Chevron Oil,* the Commission thought it was unclear whether *Beam* and its progeny apply to an "agency adjudication." *Id.* at 61,944. The Commission found it unnecessary to provide a definitive answer to that question, however, because retroactive vacatur of National's CD reduction was proper regardless whether *Beam* or *Chevron Oil* was applied.

The Commission reasoned that even under *Beam et al., Chevron Oil* would have a role to play in its analysis. For although the Commission understood the more recent cases to require that a judicial decision be applied retroactively, it also understood them to allow for "consideration of individual equities when deciding remedial issues in particular cases," *Third Order* at 61,945, *citing Beam,* 501 U.S. at 544, 111 S.Ct. at 2448 (Souter, J., joined by Stevens, J., announcing the judgment of the Court).

The Commission then took a fresh look at its *Chevron Oil* analysis. As to the first element, the Commission reaffirmed its decision that *AGD* established a new rule of law, *Third Order* at 61,946. As to the second element, the Commission determined that "the retroactive vacatur of National Fuel's CD reduction will neither further nor retard the purposes underlying [*AGD*] and Order No. 436." *Id.* Finally, as to the equities implicated by the retroactive vacatur of Na-

tional's CD reduction, the Commission found (at 61,950) that:

> (1) National Fuel did not rely to its detriment on the CD reduction provision by incurring alternative firm gas supply obligations; (2) National Fuel did not rely on the CD reduction option to enter into ... agreements to purchas[e] interruptible transportation service from Tennessee; and (3) National Fuel did not rely to its detriment by opting to reduce its CD, and in so doing, by losing the opportunity to convert its CD.

and concluded (at 61,945) that:

> [B]alancing of the equities, whether undertaken at the remedial stage under the *Beam* and *Harper* principles of retroactivity or at the initial choice-of-law level under the third prong of the *Chevron Oil* analysis ... dictates that Tennessee be afforded the same remedy that it would have obtained had National Fuel not been permitted to reduce its CD from the beginning, *i.e.*, payment to it by National Fuel of the full demand charges associated with its CD reduction.

### 4. The Fourth Order

As the reader will have guessed, National then requested rehearing, which in the fourth order under review, the Commission denied. *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol (In re: Tennessee Gas Pipeline Company)*, 66 FERC ¶ 61,266 (1994) (*Fourth Order*). Although it asserted that it "ha[d] the power ... to limit the effect of the retroactive vacatur of National Fuel's CD reduction were National Fuel to demonstrate that it had relied to its detriment on the CD reduction," the Commission (1) held that "National Fuel ha[d] not shown any detrimental reliance on its part," *id.* at 61,649; and (2) added that none of the arguments raised by National "if found to be valid would place the equities in National Fuel's favor and overcome the legal presumption for retroactivity." *Id.* at 61,650.

## II. Analysis

National, supported by one of its customers (National Fuel Gas Distribution Corpora-

tion) as intervenor, now petitions for review of the four Commission orders. National asks that we remand this case to the Commission for further evidentiary proceedings, in support of which it advances two arguments: (1) that the Commission misapplied *Chevron Oil* to vacate National's CD reduction retroactively; and (2) that the Commission should have held a formal hearing.

### A. Retroactive Vacatur of National's CD Reduction

National argues that the Commission misapplied all three of the *Chevron Oil* elements but it concentrates its fire upon the third. Specifically, the petitioner challenges the Commission's conclusion that National did not rely detrimentally upon the CD reduction aspect of Order No. 436 by foregoing its right instead to elect CD conversion. The Commission, supported by Tennessee as intervenor, defends its application of the *Chevron Oil* test, of course. Before we turn to the merits of the *Chevron Oil* dispute, however, we consider the continuing vitality of that case in light of *Beam* and its progeny.

### 1. Beam, Harper, and Hyde

In *Beam* the Supreme Court considered whether a rule of law newly announced in a judicial decision must be applied retroactively "to claims arising on facts antedating that decision." 501 U.S. at 532, 111 S.Ct. at 2441. Noting that both parties before the Court had assumed that *Chevron Oil* permitted exceptions to the rule of retroactive application in civil cases, Justice Souter (joined by Justice Stevens) concluded that *Chevron Oil* did not provide an answer. *Id.* at 537–39, 111 S.Ct. at 2444–45. He pointed out that *Chevron Oil* had been a case with no retroactive application at all—the new rule announced therein was applied neither to that case nor to others involving conduct or events occurring prior to the announcement of the new rule—and determined that the selectively retroactive application of a judicial decision "never [had] been endorsed in the civil context." *Id.*

Concluding that selective retroactivity "breaches the principle that litigants in simi-

lar situations should be treated the same, a fundamental component of *stare decisis* and the rule of law generally," *id.* at 537–38, 111 S.Ct. at 2444, and invoking "the nature of precedent, as a necessary component of any system that aspires to fairness and equality," *id.* at 543, 111 S.Ct. at 2447, Justice Souter held that it was "error to refuse to apply a rule of federal law retroactively after the case announcing the rule has already done so." *Id.* at 540, 111 S.Ct. at 2446. Four other Justices concurred separately in that view. *See id.* at 544, 111 S.Ct. at 2448 (White J., concurring in the judgment); *id.* at 547, 111 S.Ct. at 2449–50 (Blackmun J., joined by Marshall J. and Scalia, J., concurring in the judgment); *id.* at 548, 111 S.Ct. at 2450 (Scalia J., joined by Marshall J. and Blackmun J., concurring in the judgment).

Nonetheless, Justice Souter did leave open the possibility that a court might, as a remedial matter, decline to apply a judicial decision retroactively. In his view, retroactivity as a remedial matter presents a different question than does retroactivity as a "choice of law" matter (referring here to the choice between the new and the old rule). *Id.* at 538–39, 111 S.Ct. at 2444–45. Justice Souter specifically reserved judgment on the question whether a court might simultaneously apply a decision retroactively yet relieve the adverse party of its full consequences, based upon the equities of its particular case. *See id.* ("respondent [may] demonstrate reliance interests entitled to consideration in determining the nature of the remedy that must be provided …"). Indeed, the result in *Beam* highlights the distinction between choice-of-law and remedy: the Court held a Georgia tax law unconstitutional based upon the retroactive application of a recent Court decision, but expressed no opinion upon the question whether the plaintiff was entitled to a refund of the taxes it had already paid. Although none of the Justices concurring in the judgment of the Court commented separately upon Justice Souter's distinction between retroactivity as a choice-of-law and as a remedial issue, their joining in the judgment remanding the case for a determination of the proper remedy at least suggests that *Chevron Oil* may have had some continuing role to play as a remedial doctrine.

Two years later, however, in *Harper* the Supreme Court solidified its position, holding that the Court's "application of a rule of federal law to the parties before [it] requires every court to give retroactive effect to that decision." —— U.S. at ——, 113 S.Ct. at 2513. Noting that "Justice Souter's view of retroactivity [in *Beam* ] superseded 'any claim based on a *Chevron Oil* analysis,' " the Court held that "a rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law." *Id.* at ——, 113 S.Ct. at 2517.

Nonetheless, the Court still did not make entirely clear (1) whether it adhered to Justice Souter's distinction between retroactivity as a choice-of-law and as a remedial question and (2) if it did, whether *Chevron Oil* had any continuing validity. On the one hand, the Court clearly held that "the federal law applicable to a particular case does not turn on whether litigants actually relied on an old rule or how they would suffer from retroactive application of a new one," thereby suggesting that reliance interests are irrelevant, presumably even at the remedial stage. *See id.* at —— n. 9, 113 S.Ct. at 2516 n. 9. On the other hand, the Court declined to decide whether *Chevron Oil* represented "a true choice-of-law principle or merely a remedial principle for the exercise of equitable discretion by federal courts," and thus it did not expressly overrule that case. *Id.*

Moreover, the outcome of *Harper* suggested that the distinction between remedy and choice-of-law was alive and well: Reversing the decision of the Supreme Court of Virginia holding that *Chevron Oil* countenanced its failure to apply the U.S. Supreme Court's earlier decision to the later plaintiff, the Court nevertheless declined to order that the amounts paid under the unconstitutional tax be refunded, leaving "to Virginia courts … the crafting of any appropriate remedy." *Id.* at ——, 113 S.Ct. at 2520.

*Harper* was the Supreme Court's last word on retroactivity prior to the Commission's issuance of the *Third* and *Fourth Orders.* As noted above, the Commission concluded in the *Third Order* that *Chevron Oil* survived

as a remedial doctrine under which it could grant relief to a party that had acted in reliance upon the law as it stood prior to our decision supposedly announcing a new rule of law. While that conclusion is perhaps understandable after *Harper*, it is untenable in light of the Court's subsequent decision in *Reynoldsville Casket Co. v. Hyde*, —— U.S. ——, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995), which was issued only after the oral argument in this case.

In *Hyde*, the Supreme Court clearly held that retroactive application of a judicial decision cannot, except in certain limited and specifically defined circumstances, be blunted at the remedial stage. The plaintiff in *Hyde* acknowledged that her case was governed by *Harper* and that a prior decision of the Supreme Court had "retroactively invalidated the tolling provision that [made] her suit timely." *Id.* at ——, 115 S.Ct. at 1748. She nevertheless asked the Court to allow her suit to go forward, "not[ing] the possibility of recharacterizing *Chevron Oil* as a case in which the Court simply took reliance interests into account in tailoring an appropriate remedy for a violation of federal law." *Id.*

The Court, per Justice Breyer, squarely rejected that argument:

> [W]e do not see how … the Ohio Supreme Court could change a legal outcome that federal law … would otherwise dictate simply by calling its refusal to apply that federal law an effort to create a remedy.

*Id.* at ——, 115 S.Ct. at 1749. The Court then noted that the plaintiff's reliance interest was "of the same kind and degree as that involved in *Chevron Oil*," and asked rhetorically:

> If *Harper* has anything more than symbolic significance, how could virtually identical reliance, without more, prove sufficient to permit a virtually identical denial simply because it is a denial based on "remedy" rather than "non-retroactivity"? *Id.*

 In *Hyde*, the Court clearly holds that *Chevron Oil* does not allow a court to depart, even at the remedial stage, from the rule of *Harper* requiring that a judicial decision be applied retroactively. Instead, where *Harper* is applicable, a remedy other than

retroactive application of a prior decision can be awarded only in four specific circumstances:

> [A] court may find (1) an alternative way of curing the constitutional violation, (2) a previously existing, independent legal basis (having nothing to do with retroactivity) for denying relief, or (3) as in the law of qualified immunity, a well-established legal rule that trumps the new rule of law, which general rule reflects both reliance interests and other significant policy justifications, or (4) a principle of law … that limits the principle of retroactivity itself.

*Id.* at ——, 115 S.Ct. at 1751. Thus, to the extent that a court may, after *Hyde*, still depart from the norm of retroactive application based upon a party's reliance interest, its authority to do so has been limited to the most compelling circumstances. *See Ryder v. United States*, —— U.S. ——, —— – ——, 115 S.Ct. 2031, 2036–37, 132 L.Ed.2d 136 (1995) ("whatever the continuing validity of *Chevron Oil* after [*Harper*] and [*Hyde*], there is not the sort of grave disruption or inequity involved in awarding retrospective relief to this petitioner that would bring that doctrine into play"). Hence, if *Harper* is applicable here, then we do not need to consider whether the Commission properly applied *Chevron Oil*; we need only consider whether any of the four circumstances identified in *Hyde* might apply here.

2. *Retroactive application of* AGD *after* Hyde

We consider first whether *Harper* and *Hyde* apply to this case. Although those cases surely appear to require the retroactive application of *AGD* against National, the Commission argues that it is unclear whether *Harper* applies here because "the overruling of *Chevron Oil* does not necessarily govern in the context of agency action." In this regard, the agency contends that *Beam* and its progeny "are grounded on Article III of the Constitution, which is inapplicable to administrative agencies," and that "this and other courts have recognized that the overruling of *Chevron Oil* does not necessarily govern in the context of agency action," for which it cites *Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 387–88 n. 8 (3d Cir.1994);

*Atlantic Richfield v. DOE,* 977 F.2d 611, 614 (Temp.Emer.Ct.App.1992); and *District Lodge 64 v. NLRB,* 949 F.2d 441, 447 (D.C.Cir.1991).

The Commission's argument is unpersuasive for two reasons. First, Article III is not the Supreme Court's only basis for requiring the retroactive application of judicial decisions. Although the Court in *Harper* noted that "the nature of judicial review strips [a court] of the quintessentially legislative prerogative to make rules retroactive or prospective as [it] sees fit," — U.S. at —, 113 S.Ct. at 2516, which does indirectly marshal the force of Article III against prospectivity, the Court also noted that the "selective application of new rules violates the principle of treating similarly situated parties the same." *Id.* Indeed, Justice Souter in *Beam* seemed to rely primarily upon the latter point; he reasoned that selective retroactivity "breaches the principle that litigants in similar situations should be treated the same, a fundamental component of *stare decisis* and the rule of law generally." *Beam,* 501 U.S. at 537–38, 111 S.Ct. at 2444. We see no reason why that pre-constitutional rationale would apply with any less force when it falls to an agency rather than a court to apply a judicial decision. *See District Lodge 64,* 949 F.2d at 447 (citing Justice Souter's opinion in *Beam* and observing that "concern for equity and the rule of law would seem applicable" also in the agency context).

▇ Second, the Commission's Article III argument seems to miss the distinction between an administrative agency's retroactive application of a judicial decision—the case before us here—and the agency's retroactive application of its own adjudicative decision. Because Article III does not apply to an agency adjudication, the Commission may have some freedom to apply its own decisions prospectively even after *Harper. Id.* ("*Beam* does not clearly foreclose selective retroactivity" of an agency's own adjudications). *But see UFCW, Local No. 150-A v. NLRB,* 1 F.3d 24, 35 (D.C.Cir.1993) (stating that *Harper* and *Beam* may apply even to "the retroactive application of *agency* adjudications") (emphasis in original); *Southwestern Public Service Company v. FERC,* 952 F.2d 555,

563 (D.C.Cir.1992) (FERC "should take note of our recent suggestion that [*Beam*] may forbid agencies to apply rules with selective retrospectivity"). Because the decision of an Article III court, however, announces the law "as though [it] were finding it—discerning what the law is, rather than decreeing what it is ... changed to, or what it will tomorrow be," *Beam,* 501 U.S. at 549, 111 S.Ct. at 2451 (Scalia, J., joined by Marshall, J. and Blackmun, J., concurring in the judgment), all parties charged with applying that decision, whether agency or court, state or federal, must treat it as if it had always been the law. The agency must give retroactive effect to the ruling of a federal court because of the nature of that court. Just as an Article III court may not issue an advisory decision, it may not issue a decision for less than all seasons, for some citizens and not others, as an administrator shall later decide. In sum, the decision of a federal court must be given retroactive effect regardless whether it is being applied by a court or an agency.

Our conclusion here is not at all inconsistent with the three cases upon which the Commission relies. Neither *District Lodge 64* nor *Foster Wheeler* deals with the question whether an agency must apply a judicial decision retroactively. Instead, they consider only whether *Harper* requires an agency to apply its own adjudications retroactively. While *Atlantic Richfield* does deal with an agency's retroactive application of a judicial decision, it was decided before *Harper* or *Hyde;* the court declined to require the agency to apply an earlier court decision retroactively, but it did so purportedly as a remedial matter. *See District Lodge 64,* 949 F.2d at 447 ("if *Beam* is applicable to this case, its application does not entitle [the appellant] to the desired remedy ..."). In sum, neither the rationale underlying the *Harper* doctrine nor the decisions cited by the Commission give us any reason to believe that an agency may decline to apply a federal court decision retroactively.

▇ Because we think that *Harper* and *Hyde* do apply here, we do not need to determine whether the Commission correctly applied *Chevron Oil.* Instead, we need to determine only whether retroactive applica-

tion of our decision in *AGD*, vacating Order No. 436, to National's CD reduction on Tennessee "for well-established legal reasons, does not determine the outcome of [this] case," *Hyde*, —— U.S. at ——, 115 S.Ct. at 1751, or presents "any other special circumstance," *id.*, such as "grave disruption or inequity" to National. *Ryder*, —— U.S. at ——, 115 S.Ct. at 2033. We turn now to consider, under those standards, whether National's arguments provide any reason for the Commission to award Tennessee a remedy other than the retroactive application of *AGD* (and consequent vacatur of National's election of CD reduction).

■ National says that the Commission's conclusion that it did not detrimentally rely upon the CD reduction option by foregoing its right to CD conversion is arbitrary and capricious. This claim is based upon National's premise that such reliance requires that we provide Tennessee with a remedy other than the retroactive application of *AGD*. After *Hyde*, however, it is clear that simple reliance of the "sort at issue in *Chevron Oil*" and in *Hyde*, see —— U.S. at ——, 115 S.Ct. at 1751, is insufficient to warrant a departure from the rule of *Harper*. We are cognizant, moreover, of the Commission's conclusion that National's reliance arguments, even if valid, would not "place the equities in National Fuel's favor and overcome the legal presumption for retroactivity," *Fourth Order* at 61,650—a conclusion to which we owe considerable deference, see *Towns of Concord, Norwood, and Wellesley v. FERC*, 955 F.2d 67, 76 (D.C.Cir.1992) (Commission's discretion "at its zenith when the challenged action relates to the fashioning of remedies"). Against all of this, National offers us no reason to believe that the retroactive application of *AGD* to National's CD reduction would create "the sort of grave disruption or inequity" that might warrant relief from retroactivity per *Harper*. See *Ryder*, —— U.S. at —— – ——, 115 S.Ct. at 2036–38.

■ Furthermore, it is clear that the retroactive application of *AGD* to vacate National's CD reduction would fall into none of the four circumstances that Justice Breyer identified in *Hyde*. There is here involved no "previously existing, independent legal basis (having nothing to do with retroactivity) for denying relief," no "well-established general legal rule that trumps" *AGD*, nor any "principle of law ... that limits the principle of retroactivity itself." The only exception to the rule of *Harper* even possibly applicable here is the first, which allows the court (or agency) retroactively applying the new judicial decision to find "an alternative way of curing" the problem infecting the rule of law that the new rule replaced. The Court conceived that exception with "the special circumstance of the tax cases in mind": a state court may "cure" the constitutional defect in a state tax law "where the violation depends, in critical part, upon differential treatment of two similar classes of individuals ... either by similarly burdening, or by similarly unburdening, both groups." *Id.; see, e.g., McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation*, 496 U.S. 18, 40–41, 110 S.Ct. 2238, 2252–53, 110 L.Ed.2d 17 (1990); *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). This suggests that an administrative agency may be able to cure the problem that a court has found in its order—such as inadequate support in the record—and repromulgate the order with retroactive effect. We need not resolve that question today, however; while the Commission may have had the discretion to choose "an alternative way" of curing the problems we identified in *AGD*, its decision in Order No. 500–H to abandon the CD reduction provision made retroactive vacatur of the CD elections that pipeline customers had made the only way to cure the APA violation we had identified.

### B. Failure to Hold An Evidentiary Hearing

National seeks an evidentiary hearing so that it can present evidence in support of its arguments about reliance. Even if National were able to show that it relied to its detriment upon the CD reduction provision, however, the Commission would not have the discretion to deny Tennessee the remedy of retroactive vacatur of National's CD reduction. Therefore, we need not consider

whether the Commission erred by refusing to hold a hearing.

### III. CONCLUSION

For the aforementioned reasons, the petition for review is

*Denied.*