IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 5, 2023 Session

## STATE OF TENNESSEE v. TONY THOMAS and LARONDA TURNER

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. C17-00608, 17-00382 J. Robert Carter, Jr., Judge**

———————————————

**No. W2019-01202-SC-R11-CD**

———————————————

SARAH K. CAMPBELL, J., concurring in part and dissenting in part.

I join in full the majority opinion's analysis of the *Brady* issue and its judgment affirming Tony Thomas's conviction. I also agree with much of the majority's analysis regarding the accomplice-corroboration rule, including its decision to abrogate that rule. I respectfully disagree, however, with the majority's conclusion that our holding abrogating the accomplice-corroboration rule should apply only in future cases and pending cases that have not yet gone to trial. I would instead apply that holding here—and to other cases pending in trial courts or in appellate courts on direct review—and affirm Laronda Turner's conviction on that basis. I write separately to offer an additional reason why the accomplice-corroboration rule should be abrogated and to explain why our decision should apply retroactively.[1]

I.

As the majority opinion details, Tennessee is the only State with a judicially created accomplice-corroboration requirement. In the sixteen States with a similar requirement, it is imposed by statute or rule, not by judicial decision. *See State v. Jones*, 216 A.3d 907, 918 & nn.6–7 (Md. 2019). The majority's decision to abrogate our accomplice-corroboration rule rests largely on Tennessee's outlier status. It concludes that the accomplice-corroboration rule is "effectively 'obsolete' in a common law context" and that "the General Assembly is better suited to decide whether such a rule need be effectuated" in Tennessee.

---

[1] For purposes of this opinion, "retroactive" application of a judicial decision means application of a holding to the parties before the court, to cases pending in trial courts or in appellate courts on direct review, and to cases that arise in the future. *See, e.g.*, *Lease v. Tipton*, 722 S.W.2d 379, 379 (Tenn. 1986) (describing this as the "pipeline approach" to retroactivity).

1

I do not disagree with the majority's analysis in this regard, but what I find even more troubling about the accomplice-corroboration rule is that it was a departure from the common law from the beginning. Under the common law of England,[2] it was well settled that "the testimony of an accomplice, if it satisfies the jury beyond a reasonable doubt of the guilt of the defendant, may be sufficient to warrant a conviction although it is not corroborated." *Sherrill v. State*, 321 S.W.2d 811, 814 (Tenn. 1959); *see also* 7 John Henry Wigmore, *Evidence* § 2056, at 405 (Chadbourn rev. 1978) (explaining that "for a long time no question was made as to the *sufficiency* of [an accomplice's] testimony when admitted" because the "conception of an oath . . . tended to keep this question in the background"); Simon Greenleaf, *Treatise on the Law of Evidence* § 380, at 426 (1842) ("[T]he jury may, if they please, act upon the evidence of the accomplice, without any confirmation of his statement.").

Because judges harbored reasonable suspicions about the reliability of this evidence, they eventually began instructing juries to exercise caution when considering accomplice testimony and discouraged them from convicting on this evidence alone. Wigmore, *supra*, § 2056, at 405 & n.3 (citing examples from the late 1700s). Yet this practice was not "a statement of a rule of law binding upon the jury." *Id.*; *see also* Greenleaf, *supra*, § 380, at 426. It was merely a "counsel of caution" that the jury could either heed or completely disregard. Wigmore, *supra*, § 2056, at 408 (emphasis omitted).

Most state courts faithfully adopted and applied this common-law approach. *See id.* at 408 n.6 (collecting cases); *see also* Paul T. Dunn, *Accomplice Testimony: Is Corroboration Necessary?*, 6 Cath. U. L. Rev. 165, 165–66 (1957). Tennessee, however, was among the minority of courts that departed from the common law and transformed what once was a cautionary jury instruction into a strict rule of evidence. *See* Wigmore, *supra*, § 2056, at 408 n.5 (listing Tennessee as one of the "few courts" to misunderstand the English cases as establishing a rule of evidence).

It is true that the accomplice-corroboration rule has a long history in Tennessee. *See Sherrill*, 321 S.W.2d at 814 (noting that Tennessee courts "at the very beginning of the judicial history of this State . . . required corroboration in all felony cases"); *Kinchelow v. State*, 24 Tenn. (5 Hum.) 9, 12 (1844) (showing that the rule existed in Tennessee by at least the mid-nineteenth century). But our adoption of that rule was wrong as an initial matter because it marked an unjustified departure from the governing common law of England. If there was a need to depart from the common law for policy reasons, that was a decision the legislature should have made in the first instance. I therefore agree with the Court's abrogation of the accomplice-corroboration rule, but I do so primarily because it is a long-overdue course correction.

---

[2] When Tennessee became a State, it was governed by the common law of England "as it stood at and before the separation of the colonies." *Smith v. State*, 385 S.W.2d 748, 750 (Tenn. 1965); *see also Moss v. State*, 173 S.W. 859, 861 (Tenn. 1915) (explaining that Tennessee derived its common law from North Carolina, which had adopted the common law of England).

## II.

Although I join the majority in abrogating the accomplice-corroboration rule, I disagree with its decision to apply this holding only prospectively to "trials commencing after the date of the mandate." For three reasons, the holding instead should apply retroactively to this case and others in the pipeline. *First*, retroactivity has long been a hallmark of judicial decisionmaking. *Second*, our precedents consistently have applied overruling decisions in criminal cases retroactively even when they disadvantage the defendant. *Third*, prospective overruling gives the Court too much discretion and poses a significant threat to stare decisis.

## A.

A "fundamental rule of 'retrospective operation' . . . has governed '[j]udicial decisions . . . for near a thousand years.'" *Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 94 (1993) (second and third alterations in original) (quoting *Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 372 (1910) (Holmes, J., dissenting)). This traditional rule of retroactivity is rooted in the Blackstonian view that judges "do not make the law but only declare what it has always been." Allan Beever, *The Declaratory Theory of Law*, 33 Oxford J. Legal Stud. 421, 421 (2013); *see also* 1 William Blackstone, *Commentaries* \*69 (explaining that the role of a judge is not "to pronounce a new law, but to maintain and expound the old one" based on "the known laws and customs of the land"). In Blackstone's view, even when the need arises to overrule a precedent, a judge does not "make a new law" but rather "vindicate[s] the old one from misrepresentation." *Id.* at \*70. If a former judicial decision is "manifestly absurd or unjust" so that it must be overruled, "it is declared, not that such a sentence was *bad law*, but that it was *not law*; that is, that it is not the established custom of the realm." *Id.* It therefore follows that retroactivity is "an inherent characteristic of the judicial power." *Harper*, 509 U.S. at 107 (Scalia, J., concurring) (noting that the "original and enduring American perception of the judicial role sprang" from Blackstone's jurisprudence).

This longstanding principle of judicial retroactivity is "sometimes said to inhere in the very structure of the Constitution." Bryan A. Garner et al., *The Law of Judicial Precedent* 309 (2016). Congress has the power to make "forward-looking laws of general applicability but [is] generally forbidden to act retroactively." *Id.* Judges, meanwhile, "look backward, resolving specific cases and controversies and pronouncing what the law *is*." *Id.* In this way, the retroactivity of judicial decisions serves as the "principal distinction" separating the judiciary from the legislature. *Harper*, 509 U.S. at 107 (Scalia, J., concurring); *see also* Robert von Moschzisker, *Stare Decisis in Courts of Last Resort*, 37 Harv. L. Rev. 409, 426 (1924) (arguing that prospective decisionmaking is "plain and outright legislation by the courts"); Candler S. Rogers, *Perspectives on Prospective Overruling*, 36 UMKC L. Rev. 35, 45 (1968) (noting that "prospective overruling by its very nature appears more like legislation than overruling which is given retrospective

effect"); Neil M. Gorsuch, *Of Lions and Bears, Judges and Legislators, and the Legacy of Justice Scalia*, 66 Case W. Res. L. Rev. 905, 909–10 (2016) (noting that the founders "understood the legislative power as the power to prescribe new rules of general applicability for the future" and the "judicial power as . . . a backward-looking authority").

Many state courts initially adopted the Blackstonian view and applied newly announced decisions retroactively, including in criminal cases. *See, e.g.*, *Falconer v. Simmons*, 41 S.E. 193, 196 (W. Va. 1902) (describing "the fundamental rule" that "when former decisions are overruled they are considered as never having been the law"); *Storrie v. Cortes*, 38 S.W. 154, 159 (Tex. 1896) ("The policy of conferring upon this court the power to limit its decisions to the future is a question for the people, and we cannot, under any notion of injustice, overstep the constitutional limitation to our power, no matter howsoever desirable the departure might be."); *Lanier v. State*, 57 Miss. 102, 107 (1879) ("The doctrine of *stare decisis* in criminal cases cannot be carried to the extent of allowing to violators of law a vested interest in rules which have been erroneously sanctioned."); *State v. Williams*, 13 S.C. 546, 560 (1880) (overruling precedent limiting the criminal jurisdiction of general sessions court and affirming conviction on that basis); *see also* Robert Hill Freeman, *The Protection Afforded Against the Retroactive Operation of an Overruling Decision*, 18 Colum. L. Rev. 230, 239 (1918) (noting that "strict and logical adherence" to the Blackstonian view "led many courts to refuse to circumvent in any way the retroactive effect of an overruling decision"). At that time, there was only one well-established exception to the general rule of retroactivity: courts would refuse to apply an overruling decision retroactively when that decision involved the interpretation of constitutional or statutory law and would impair vested contract rights. *See, e.g.*, von Moschzisker, *supra*, at 422.

In the early twentieth century, state courts began to deviate from the traditional rule of retroactivity more frequently. *See State v. O'Neil*, 126 N.W. 454, 454–57 (Iowa 1910); *State v. Fulton*, 63 S.E. 145, 147–48 (N.C. 1908); *State v. Bell*, 49 S.E. 163, 164–65 (N.C. 1904).[3] "These early cases, both civil and criminal, involving both common-law rules and statutory interpretations, made much of the extreme and singular plight of the parties who had reason to rely on the earlier, overruled decision." Beryl Harold Levy, *Realist*

---

[3] For a time, the United States Supreme Court also departed from the traditional rule of retroactivity and embraced the practice of prospective decisionmaking. In criminal cases, the Supreme Court adopted a three-part test to determine whether a newly announced constitutional rule should have retroactive effect. *See Desist v. United States*, 394 U.S. 244, 249 (1969). A similar test was adopted for civil cases as well. *See Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07 (1971). In application, both of these tests "created confusion and inconsistent results." Garner et al., *supra*, at 312. The Supreme Court eventually changed course, returning to the general rule of retroactivity in both criminal and civil cases. *See Griffith v. Kentucky*, 479 U.S. 314, 322 (1987) (holding that "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication"); *Harper*, 509 U.S. at 97–98 (holding that newly announced decisions "must be given full retroactive effect" unless the Court explicitly "reserve[s] the question" of retroactivity) (quoting *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 539 (1991))).

4

*Jurisprudence and Prospective Overruling*, 109 U. Pa. L. Rev. 1, 8–9 (1960). Yet they did not adopt prospective overruling as a "general and consistent judicial practice." *Id.* at 9.

As the trend of prospective overruling continued, the question soon arose whether the federal Constitution *requires* state courts to apply their decisions retroactively. The United States Supreme Court considered this question in 1932 and held that "the Federal Constitution has no voice upon the subject." *Great Northern Ry. Co. v. Sunburst Oil & Refin. Co.*, 287 U.S. 358, 364 (1932). "[I]n defining the limits of adherence to precedent," the Court explained, a State "may make a choice for itself between the principle of forward operation and that of relation backward." *Id.* That choice is to be determined "by the juristic philosophy of the judges [of the State's] courts, their conceptions of law, its origin and nature." *Id.* at 365.

The United States Supreme Court has identified only one situation in which a court *must* decline to apply its decision retroactively: when retroactive application would violate the Due Process Clause. *See, e.g.*, *Rogers v. Tennessee*, 532 U.S. 451, 462 (2001). A judicial decision that alters "a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect, only where it is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" *Id.* (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964)).

*Rogers* arose from the Tennessee Supreme Court's abrogation of the common-law year-and-a-day rule, which provided that "no defendant could be convicted of murder unless his victim had died by the defendant's act within a year and a day of the act." *Id.* at 453. The United States Supreme Court held that our Court could apply that decision retroactively, without violating the Due Process Clause, because the rule "ha[d] been legislatively or judicially abolished in the vast majority of jurisdictions recently to have addressed the issue" and "had only the most tenuous foothold as part of the criminal law of the State of Tennessee." *Id.* at 463–64.

*Rogers* made clear that constitutional limits on retroactive judicial decisions are grounded in the "core due process concepts of notice, foreseeability, and, in particular, the right to fair warning," and not in the federal Ex Post Facto Clause. *Id.* at 459. The Court reaffirmed that "[t]he Ex Post Facto Clause, by its own terms, does not apply to courts" and cautioned that "[e]xtending the Clause to courts through the rubric of due process" would "circumvent the clear constitutional text" and "evince too little regard for the important institutional and contextual differences between legislating, on the one hand, and common law decisionmaking, on the other." *Id.* at 460 (emphasis omitted).

Justice Scalia dissented in *Rogers*. In his view, the Tennessee Supreme Court had acted as a legislature in abolishing the year-and-a-day rule and thus should be held to the same standard. *See id.* at 476–78 (Scalia, J., dissenting). He pointed out that our Court "made no pretense that the year-and-a-day rule was 'bad' law from the outset" but instead

5

asserted that "the need for the rule, as a means of assuring causality of the death, had disappeared with time." *Id.* at 477. That sort of change, Justice Scalia explained, was "a matter for the legislature, beyond the *power* of the court." *Id.* But even under Justice Scalia's conception of due process limits on retroactive judicial decisions, a court "would remain free to conclude that a prior decision or series of decisions . . . was in error, and to apply that conclusion retroactively" so long as fair-notice requirements are satisfied. *Id.* at 481.

Following *Sunburst*, state courts adopted varying tests and standards for determining whether a decision should apply retroactively. Some courts viewed due process restrictions as a floor and identified other circumstances in which a court should decline to apply a decision retroactively. Many of those courts "settled on some variation" of the three-factor test first formulated by the United States Supreme Court in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07 (1971). *See* Richard S. Kay, *Retroactivity and Prospectivity of Judgments in American Law*, 62 Am. J. Compar. L. 37, 42 & n.25 (2014). That test considers whether the decision "establish[es] a new principle of law," whether retroactive application will further the operation of the new rule, and whether and to what degree retroactive application would be inequitable. *Chevron Oil*, 404 U.S. at 106–07.

Other courts, however, decided to treat due process limits as both a floor and a ceiling and have applied decisions retroactively unless doing so would violate the Due Process Clause. *See, e.g.*, *State v. Redmond*, 631 N.W.2d 501, 508 (Neb. 2001) (holding that retroactive application of decision satisfies the Due Process Clause and declining to consider Ex Post Facto principles); *Miller v. State*, 457 S.W.3d 919, 927–29 (Tex. Crim. App. 2015) (applying decision retroactively after determining that it does not violate the Due Process Clause); *Armstrong v. State*, 848 N.E.2d 1088, 1092–95 (Ind. 2006) (same).

As *Rogers* illustrates, and as explained more fully below, Tennessee generally has followed the latter approach until today. And for good reason. If state courts are to make a choice between retroactive and prospective application based on their "conceptions of law, its origin and nature," *Sunburst*, 287 U.S. at 365, the better path is to follow the traditional rule of retroactivity. That rule reflects a correct understanding of the judicial role—to say what the law *is*, rather than what it *should be*—and preserves the important distinction between the judicial and legislative branches. Any other approach would unsettle these bedrock principles.

B.

The majority's decision to apply its abrogation holding only prospectively perhaps could be justified if our precedents required that result. But they do nothing of the sort. To the contrary, we have consistently given retroactive effect to decisions overruling criminal-law precedents even when those decisions disadvantaged the defendant.

In *State v. Collier*, this Court partially abrogated the exact same accomplice-corroboration rule that is at issue here by holding that "the testimony of a victim of statutory rape does not require corroboration." 411 S.W.3d 886, 888 (Tenn. 2013).[4] The defendant in that case relied on the corroboration rule to argue that the evidence was insufficient to support his conviction. *Id.* at 893. At the time, Tennessee "remained among a small minority of jurisdictions that ha[d] adhered to the rule classifying a victim of a statutory rape as an accomplice and requiring corroborative evidence." *Id.* at 894. We overruled those decisions, rejected the defendant's sufficiency-of-the-evidence challenge on that basis, and affirmed his conviction. *Id.* at 898–900 ("[H]aving determined that no corroboration of the victim's testimony is required, we conclude that the evidence presented at trial was sufficient for a rational trier of fact to find the essential elements of aggravated statutory rape beyond a reasonable doubt."). *Collier* implicated precisely the same fairness and reliance concerns that the majority and separate opinions fixate on today, yet we had no problem applying our holding retroactively in that case. It is hard to see why the case currently before us should be treated any differently.

*Collier* was no aberration. In *State v. Dorantes*, we overruled earlier precedents that required the State to satisfy a higher evidentiary threshold when relying on circumstantial evidence. 331 S.W.3d 370, 379–81 (Tenn. 2011). We instead decided to follow the federal rule that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *Id.* at 381. Despite acknowledging that application of the newly announced standard "could result in a different outcome" in that case, we applied our holding retroactively and concluded that "the evidence, even though entirely circumstantial, [was] sufficient to support the jury's finding of guilt beyond a reasonable doubt." *Id.* at 381, 389–90.

We followed the same course in *State v. Rogers* when we abolished the year-and-a-day rule. 992 S.W.2d 393 (Tenn. 1999). Notwithstanding that application of the rule would have protected the defendant from homicide charges, we applied our holding retroactively and affirmed the defendant's conviction for second-degree murder. *Id.* at 402–03. Our only inquiry with respect to retroactivity was whether retroactive application would violate the due process provisions of the federal and state constitutions. After concluding that it would not, we "appl[ied] our decision abolishing the rule retroactively to the facts of th[at] case"

---

[4] The majority asserts that the Court abrogated only "an *exception* to the accomplice-corroboration rule, not a part of the rule itself." That characterization is misleading. The rule we abrogated in *Collier* required corroboration for the testimony of a minor victim of statutory rape and was part of the accomplice-corroboration rule as it had developed in Tennessee. We referred to that rule as an exception in *Collier* only because it was a deviation from our usual test for determining who should be considered an accomplice under the accomplice-corroboration rule. *See* 411 S.W.3d at 895–96 (explaining that the rule emerging from our previous cases was that "a minor, even though legally incapable of being charged with a sex crime because of his or her age, may nevertheless qualify as an accomplice whose uncorroborated testimony cannot support a conviction"). Our abrogation of the rule at issue in *Collier* disadvantaged the defendant in the same manner as our decision here, by eliminating the requirement that a witness's testimony be corroborated.

without considering other factors such as general fairness principles or reliance interests. *Id.* at 402.

Our strong preference for retroactivity is evident in earlier cases, too. In *State v. Matthews*, we considered the interpretation of a statute allowing a defendant charged with embezzlement of public funds to avoid prosecution by tendering the funds to their rightful owner. 226 S.W. 203, 205–06 (Tenn. 1920) (citing Shannon's Code § 6575). Earlier precedents had misconstrued that provision as applying to defendants charged with embezzlement of *private* funds. The defendant in *Matthews*, who was charged with embezzlement of private funds, raised tender as a defense, and the trial court discharged him from prosecution. *Id.* at 205. We overruled our earlier precedents, clarified that the statute at issue applied only to embezzlement of public funds, and reversed the trial court's judgment. *Id.* at 207. In doing so, we cited approvingly to the Mississippi Supreme Court's statement in *Lanier* that "the doctrine of stare decisis in criminal cases cannot be carried to the extent of allowing violators of the law a vested interest in rules which have been erroneously sanctioned." *Id.* at 206–07 (citing *Lanier*, 57 Miss. at 107).

My research identified only one criminal case in which we declined to apply a new decision retroactively. In *Sommerville v. State*, the Court held for the first time that, in a retrial, "a juror with knowledge of the verdict and sentence of the prior jury shall be subject to challenge for cause, unless the examination shows, unequivocally, that he can be impartial," and we prescribed certain procedures for conducting the examination. 521 S.W.2d 792, 797 (Tenn. 1975). Although we held that these rules "shall be given prospective application only," we ultimately granted relief to the defendant in that case—who received a harsher sentence after a second trial from a jury with knowledge of his prior sentence—by remanding to the trial court for entry of a judgment "pronouncing the same sentence as the first jury." *Id.* at 797–98. It appears, then, that we declined to apply the for-cause challenge holding retroactively only because an alternative remedy existed that would not require a new trial. This unique situation is not implicated here.

To be sure, these precedents do not expressly forbid this Court from applying an overruling decision retroactively. But they reflect a longstanding and unbroken practice of retroactive application in situations similar to the one presented here.[5] I would follow our

---

[5] We have adopted a slightly different approach in civil cases: "In civil cases retrospective application of a decision overruling an earlier decision ordinarily is denied only if such an application would work a hardship upon those who have justifiably relied upon the old precedent." *Calaway ex rel. Calaway v. Shucker*, 193 S.W.3d 509, 518 (Tenn. 2005) (quoting *Marshall v. Marshall*, 670 S.W.2d 213, 215 (Tenn. 1984)). Even under that standard, a "rigorous" showing is required to obtain prospective application, and there "should be few occasions when prospective overruling can justifiably displace the normal retroactive application of the overruling decision." *Marshall*, 670 S.W.2d at 215 (quoting Roger J. Traynor, *Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility*, 28 Hastings L.J. 533, 561–62 (1977)).

precedents and apply our holding abrogating the accomplice-corroboration rule retroactively in this case and others in the pipeline.

As explained above, the general rule of retroactivity must give way when retroactive application of an overruling decision would violate the Due Process Clause. But Turner has not raised a due process objection. And neither the majority opinion nor Justice Lee's separate opinion contends that retroactive application is constitutionally forbidden here. That is not surprising, because any due process challenge almost certainly would fail under the standard set out in *Rogers*. The accomplice-corroboration rule marked a departure from the common law of England and has been widely rejected by both courts and legislatures. Abolition of the rule thus cannot be said "to be unexpected and indefensible by reference to the law as it then existed." *Rogers*, 532 U.S. at 464 (noting that "the fact that a vast number of jurisdictions have abolished a rule . . . is surely relevant to" this inquiry).

Even if more general concerns about fairness or reliance interests were relevant to the retroactivity analysis, they would not tip the balance. Turner has not relied on the accomplice-corroboration rule to guide her primary conduct or order her daily affairs. *See* Thomas S. Currier, *Time and Change in Judge-Made Law: Prospective Overruling*, 51 Va. L. Rev. 201, 254 (1965) (noting that criminal law "is not an area where people are apt to have acted in reliance on perceived law"). The only conceivable way in which Turner might have relied on the rule is to develop her litigation strategy. But the exact same reliance interest was implicated by our decisions in *Collier*, *Dorantes*, *Rogers*, and *Matthews* and we still adhered to the traditional rule of retroactivity in those cases.[6]

Rather than look to our own precedents regarding retroactive application of overruling decisions, the majority relies primarily on the reasoning of Maryland's high court in *State v. Jones*. That reliance is misplaced. Unlike Tennessee, Maryland has long required prospective-only application in criminal cases whenever a newly announced decision benefits the State. *See Jones*, 216 A.3d at 923. Also unlike Tennessee, Maryland considers general Ex Post Facto principles in its analysis notwithstanding that the Ex Post Facto Clause does not apply to judicial decisions. *Id.* at 921. We have never adopted an approach resembling the one that Maryland employs, and we should not do so now.

C.

Unfortunately, it is not entirely clear what approach the majority adopts today. The majority opinion does not articulate any test to govern the retroactivity inquiry in future cases. It instead seems to endorse an amorphous inquiry that considers only whether

---

[6] The majority argues that *Dorantes* and *Rogers* are distinguishable because they involved rules that were not frequently applied or whose application rarely affected the outcome of the case. The problem with that argument is that application of the rules would have been outcome-dispositive *in those cases*, and we still applied our overruling decisions retroactively.

9

retroactive application would further "the interest of fairness." This approach does little to constrain the Court's discretion in future cases and effectively means that the longstanding rule of retroactivity may be discarded whenever a majority of this Court wants.

This prospect should concern anyone who cares about stare decisis. Under the traditional rule of retroactivity, judges must carefully consider whether an overruling decision will upset reliance interests or result in unfairness or prejudice because those results cannot be avoided by declaring that a holding will apply only prospectively. In this sense, the rule of retroactivity puts a thumb on the scale in favor of adherence to precedent. *See* Note, *The Effect of Overruled and Overruling Decisions on Intervening Transactions*, 47 Harv. L. Rev. 1403, 1412 (1934) (recognizing that retroactivity acts as "an automatic check upon overruling"). Purely prospective decisionmaking, by contrast, "tends to cut [courts] loose from the force of precedent . . . and thereby mitigate[s] the practical force of stare decisis." *Williams v. United States*, 401 U.S. 667, 680 (1971) (Harlan, J., concurring); *see also Harper*, 509 U.S. at 105 (Scalia, J., concurring) ("Prospective decisionmaking is the handmaid of judicial activism, and the born enemy of *stare decisis*."). The majority's decision to prospectively overrule the accomplice-corroboration rule sets a dangerous precedent that could ultimately weaken the force of stare decisis.

\* \* \*

It may seem harmless occasionally to depart from the traditional rule of retroactivity to achieve "fairness" in a particular case, but there are other important principles at stake. I would apply our decision overruling the accomplice-corroboration rule retroactively because that approach is consistent with the historical role of the judiciary, faithfully adheres to our precedents, and constrains judicial discretion. To the extent fairness concerns exist, they are better addressed as part of the due process analysis that applies to retroactive judicial decisionmaking. I therefore respectfully dissent from the majority's retroactivity analysis, its conclusion that the decision abrogating the accomplice-corroboration rule should apply only prospectively, and the judgment reversing Turner's conviction.

_____
SARAH K. CAMPBELL, JUSTICE